**Warren H. RUSHTON and David L. Lostroh, Plaintiffs,**

**v.**

**NEBRASKA PUBLIC POWER DISTRICT, Bernard M. DeLay, Don E. Schaufelberger, Gene D. Watson, Theodore Kyster, Lawrence G. Kuncl, Jay M. Pilant, Robert E. Wilbur, G.S. McClure, Defendants.**

**No. CV86–L–308.**

United States District Court, D. Nebraska.

Feb. 23, 1987.

Douglas Veith, Bellevue, Neb., for plaintiffs.

Fredric H. Kauffman and Shawn Renner, Lincoln, Neb., for defendants.

## MEMORANDUM OF DECISION

URBOM, District Judge.

Trial was held from January 6, 1987, to January 13, 1987, to determine the constitutionality of the Nebraska Public Power District (NPPD) fitness for duty-drug/alcohol testing program as it applies to the plaintiffs. By agreement of the parties, this court will determine the validity of the initial program implemented on November 1, 1985, and the recent program outlined in NPG Directive 2.3. The new program is effective January 15, 1987, with the relevant exception that the random testing component is effective April 1, 1987. Both programs are challenged by the plaintiffs as violative of the First, Fourth, Fifth, Ninth, and Fourteenth Amendments to the Constitution of the United States and as violative of similar provisions of the Constitution of the State of Nebraska.

## I. FACTUAL BACKGROUND

NPPD is a public corporation and political subdivision of the state of Nebraska and is organized under the laws of that state. NPPD owns Cooper Nuclear Station (CNS), a nuclear power plant. As a licensee of the Nuclear Regulatory Commission (NRC), Cooper Nuclear Station (CNS) is a heavily regulated facility. Consequently,

CNS must meet all the applicable rules imposed by the NRC in 10 C.F.R. Parts 0 to 199. CNS must also adhere to the requirements contained within the Updated Safety Analysis Report (USAR) (a detailed description of the CNS design submitted to the NRC for approval) and other technical specifications. To assure compliance with the various NRC regulations, the NRC maintains resident inspectors at the site and sends inspection teams to investigate plant security. This close regulatory oversight provides, to the extent humanly practicable, the safe operation of CNS.

At the outset it is necessary to describe the plant site, the manner of admittance to the facility, and the distinction between the protected and the vital areas. The protected area of CNS is completely surrounded by a fence, except at the point where the fence meets the security building. To enter the protected area, one must proceed through the entrance of the security building and pass, in single file, through explosive and metal detector devices. Random pat-downs are routinely performed and guards observe entrants for erratic behavior. Once within the confines of the protected area, each of the 700 individuals who are permitted unescorted access participate in the honor system. Variously located throughout the protected area are vital areas. Each vital area is a room with a door requiring a separate access code for entrance. The vital areas house the safety related equipment, the equipment designed to prevent or mitigate a radiological release.

### 1. Documentary Evidence

It also appears necessary to recount events transpiring prior to the implementation of the NPPD Fitness For Duty (FFD) program, to cast this case in its proper light. On August 5, 1982, the NRC published a proposed rule requiring, in relevant part, that nuclear power plant licensees establish, document, and implement fitness for duty programs to assure that personnel with unescorted access to protected areas are not under the influence of drugs or alcohol or otherwise unfit for duty. The proposed rule was spawned by NRC concern that personnel with access to a protected area may become unfit for duty due to the effects of alcohol or drugs.

The NRC stated that the number of drug-related incidents involving on-site use or possession of drugs and personnel reporting to work under the influence of controlled substances had increased substantially over the past three years. Those persons with unescorted access to protected areas were chosen because such personnel "may have the opportunity to affect adversely the health and safety of the public through an unobserved act, whether intentional or inadvertent." NRC personnel were not included. In recognition of the unique concerns of each facility, the NRC stated that its proposed rule was broad in scope to permit each licensee to tailor procedures to its own needs. Additionally, the NRC invited public comment on the level of specificity necessary for the proposed rule. Exhibit # 101. .

The Nuclear Utilities Management and Human Resources Committee (NUMARC), an agency composed of representatives from each utility operating a nuclear plant, formulated a proposal on FFD which was intended to be an alternative to rulemaking. On April 18, 1986, the NUMARC steering committee informed its executive group members that the original proposal was rejected by the NRC because the policy failed to establish clear guidelines regarding drugs and alcohol at nuclear power plants and to describe the minimum essential elements of an acceptable fitness for duty program. The consensus among the steering committee members was that "effective monitoring and testing procedures" includes preemployment and for-cause chemical testing, but that random chemical testing was not necessary. Exhibit # 42. The testimonial evidence indicated that a policy endorsed by the steering committee represents the "lowest common denominator" to which all members will agree.

On August 4, 1986, the NRC withdrew the proposed rule published on August 5, 1982. Instead, the NRC issued a policy

statement in recognition of and to further encourage the initiatives taken by the nuclear power industry, NUMARC, and the Institute of Nuclear Power Operations (INPO) regarding fitness for duty. The NRC noted that the pervasiveness of drug and alcohol abuse in our society led it to conclude that such abuse exists in the nuclear industry. The NRC cited various reports indicating that industrial accidents due to chemical abuse are ever-increasing and are quite costly. Consequently, the NRC determined that "appropriate precautionary measures [must be taken] to reduce the probability that a person who is under the influence of alcohol, other drugs, or who is otherwise unfit for some task involving a nuclear power unit, may cause an accident or react inadequately to an accident." Exhibit # 102.

The Policy Statement promulgated by the NRC on August 4, 1986, indicated that licensees were to develop and implement FFD (fitness for duty) programs using the guidance of the Edison Electric Institute's (EEI's) "EEI Guide to Effective Drug and Alcohol/Fitness for Duty Policy Development" booklet. Such measures were deemed necessary to provide reasonable assurance that all nuclear power plant personnel with access to vital areas of operating plants are fit for duty. The NRC set forth the minimum essential elements for an acceptable fitness for duty program:

(1) A provision that the sale, use, or possession of illegal drugs within the protected area will result in immediate revocation of access to vital areas and discharge from nuclear power plant activities. The use of alcohol or abuse of legal drugs within the protected area will result in immediate revocation of access to vital areas and possible discharge from nuclear power plant activities.

(2) A provision that any other sale, possession, or use of illegal drugs will result in immediate revocation of access to vital areas, mandatory rehabilitation prior to reinstatement of access, and possible discharge from nuclear power plant activities.

(3) Effective monitoring and testing procedures to provide reasonable assurance that nuclear power plant personnel with access to vital areas are fit for duty.

Subject to the continued success of the industry initiatives and the NRC ability to monitor the effectiveness of licensees' programs, the NRC represented that it would refrain from rulemaking on fitness for duty programs for nuclear power plant personnel for a minimum of eighteen months. In addition, the NRC stated that use of the policy statement did not affect its ability to issue orders, call enforcement meetings, suspend licensees for significant safety violations, or conduct necessary inspections or other appropriate enforcement activities for failure to satisfy regulatory requirements. Exhibit # 41.

### 2. Testimonial Evidence

The testimonial evidence indicates that the FFD program initially implemented by NPPD was instituted for several reasons. First, NPPD was informed by the NRC in the summer of 1985 of allegations of drug use by security guards and licensed operators at CNS. The NRC did not disclose the source of such information, but required proof that CNS employees were fit for duty. The guard force was tested and two positive findings were made. Neither positive determination was confirmed, as one guard later tested negative and the second guard chose not to be tested again. Second, NPPD was spurred into action by the national crisis related to drug abuse. Third, CNS was scheduled to undergo a power outage beginning in the fall of 1984 and continuing for the next eleven months. During this time the plant was shut down. Given the grave concerns voiced by the NRC as to drug use at CNS, NPPD feared that the NRC would insist that CNS remain inoperable after the shut-down until evidence was forwarded to the NRC establishing that CNS personnel were fit for duty. Consequently, on April 16, 1985, NPPD gave written assurance to the NRC that a

drug screening program would be effectuated shortly. Exhibit # 40.

### 3. Fitness for Duty Program # 1

The testimonial evidence indicates that the first FFD program was developed by the early fall of 1985, principally to assuage NRC concerns of drug usage at CNS. It was decided that testing beyond for-cause and pre-employment screening was warranted at CNS. Annual testing and testing of transfers were included to assure a more effective program. In determining who would be subject to the testing program, the initial focus was centered on the security force and licensed operators, since each was a source of concern for the NRC. Upon examination it was determined that anyone permitted unescorted access to the protected area of CNS should be subject to a drug and alcohol urinalysis.

The screening procedure outlined in the first FFD program indicates, in relevant part, that non-CNS employees are forwarded a drug/alcohol testing packet in a sealed container. The packet contains a consent form, a 50 ML screw-cap specimen container, a specimen container label, a prepaid postage container for return of the specimens to the testing lab, and an instruction sheet. Non-CNS employees, such as the plaintiffs,

"can either utilize their supervisor as a witness for the collection of the specimen, or they can deliver this packet to a medical facility of their choice where a physician or physician's assistant will act as a witness to the collection of the specimen. The District will reimburse the medical facility for costs incurred for this service upon receipt of proper billing. As directed on the instruction sheet contained in the packet, the individual who witnessed the collection of the sample will then reseal the packet and deliver it through normal channels to the U.S. Postal Service for delivery to the testing laboratory."

After an analysis is completed by the laboratory, a written report is forwarded to the security specialist at NPPD general office. If the results are negative, the employee's supervisor is notified and the supervisor notifies the individual tested. If the results are positive, the employee's supervisor and the Assistant General Manager-Nuclear are notified. Each employee is entitled to an appeal of the results by requesting a second or confirmation test.

The confirmation test is conducted by the same testing laboratory utilizing the same specimen. A different technician performs an analysis of all substances detected as positive in the initial screening. The results of the second test are final and binding. If the results are negative, no further action is taken. If the results are positive, the employee is immediately denied unescorted access to the protected area and is provided the option of participating in the employee assistance program or being subject to disciplinary action, up to and including discharge. An employee who chooses to participate in the employee assistance program will not be permitted access until it is determined through medical evidence that the employee is "clean". Exhibit # 1.

The plaintiffs do not argue that the for-cause testing offends their constitutional rights, nor do the plaintiffs profess standing to argue the unconstitutionality of the preemployment or transfer screening. Rather, the constitutional challenge is directed exclusively at the requirement of annual testing. For CNS employees, the test date corresponds to their annual physical examination and for NPPD personnel, the test date corresponds to the employee's anniversary date. The plaintiffs, as engineers employed by NPPD, were required to undergo a urinalysis on or before their respective anniversary dates. Since such dates expired prior to trial, the plaintiffs successfully sought injunctive relief to prevent their termination from NPPD prior to the resolution of the case.

### 4. Fitness for Duty Program # 2

The NPPD directive 2.3 applies to NPPD employees as well as contractors, consultants, vendor employees, NPPD senior management, and NRC employees who are permitted unescorted access to protected areas. For the purposes of this case, the

relevant changes in the second FFD program concern the addition of the random method of testing. The new policy retains testing for pre-employment, for-cause, annual, and transfers. Since the random component of the present program is applicable to the plaintiffs, this additional element is subject to scrutiny.

The new program also incorporates additional security precautions in the collection of the specimen, including a chain-of-custody form; removal of bulky and outer layers of clothing (coats, boots, etc.); removal of a hot water supply from the testing area; being escorted to the testing area; no visual observation of the voiding of the specimen, but the witness must remain observant of any attempts to alter the sample; and the witness must be assured that the specimen is warm.

Additionally, the directive contains information regarding the Employee Assistance Program. Employees are encouraged to seek assistance voluntarily through the program for personal drug or alcohol problems before the need for management or disciplinary measures arises. Participation in the program does not preclude disciplinary actions for violations occurring prior to or after volunteering for the program.

The directive also states that illegal use, sale, or possession of drugs during working hours is cause for discharge. Off-the-job use, sale, or possession of illegal drugs is also cause for disciplinary action which may include discharge. (These warnings also appear in the NPPD employee handbook).

The drug and alcohol testing includes a urinalysis and an analysis of breath samples. A positive result from the testing procedure results in immediate revocation of unescorted access to CNS, suspension of all duties, and administrative leave without pay. The employee has the option of participating in the Employee Assistance Program or facing discharge in accordance with the NPPD disciplinary/termination policies. If the employee elects to participate in the Employee Assistance Program, the employee is considered on leave status.

The employee is denied unescorted access until the post rehabilitation tests are satisfactorily completed.

Upon arrival at the testing laboratory of the Lutheran Medical Center, the specimen is divided into two equal parts. The first half of the specimen is analyzed by the Enzyme Multiple Immunoassay Test (EMIT) procedure and followed, if necessary, by a confirmatory test. If the EMIT result is negative, the test is negative. If the EMIT result indicates the presence of any tested-for substance, the specimen undergoes a confirmatory test. The tested-for substances include: amphetamines, benzodiazepines, cocaine, methaqualone, phencyclidine, barbiturates, cannabinoids, methadone, opiates, and propoxyphene. The confirmatory tests include thin layer chromatography, liquid chromatography, gas chromatography or gas chromatography/mass spectrometry. The confirmatory test used is dependent upon the substance found in the sample. If the confirmatory test result is negative, the test is negative. If the confirmatory test is positive, NPPD is notified immediately and the remaining half of the specimen is retained until further instructions from NPPD are forwarded.

## II. FIRST AMENDMENT CHALLENGE

### 1. Religious Objections

The first and most unusual issue is whether the fitness for duty programs implemented by NPPD interfere with the plaintiffs' first amendment guarantee of free exercise of religion. I find that both programs burden the plaintiffs' religious practice; but, under the unique circumstances of this case, either program is the least restrictive alternative available to NPPD to satisfy its compelling interest in assuring the health and welfare of the public and its employees.

The primary religious objection to the FFD programs involves an analysis of the initial FFD program and the NPPD employee assistance program (EAP). The analysis is equally applicable to the present

FFD program. The FFD program provides that upon a positive test result:

"that employee will be given the *choice* of participation in the employee assistance program or be subject to disciplinary action up to and including discharge." (emphasis added)

Exhibit # 1. The plaintiffs argue that the inclusion of a reference to the EAP necessarily incorporates by reference the EAP program into the FFD program. The incorporation of the EAP program is significant because the EAP provides, in relevant part, that:

"For purposes of this policy, alcoholism is recognized as an illness for which there is effective treatment and rehabilitation. Alcoholism is defined as an illness in which a person's consumption of any alcoholic beverage definitely and repeatedly interferes with an employee's work performance and/or health. The concern of this policy with regard to alcoholism is strictly limited to its effects on the employee's work situation and attendance."

Exhibit # 65.

The plaintiffs also advance other religious objections to the FFD program but I do not find them to have constitutional merit. First, the plaintiffs perceive the FFD program as "insincere" and "somewhat deceptive and fraudulent" program since it erroneously represents to the public the "appearance of sporadic safety" and the "appearance that people are not going to be on drugs" at CNS. Such objections are inconsonant with the plaintiffs overall contention at trial that the numerous redundant safety systems and security measures presently utilized by NPPD are effective that CNS is safe and without need of a FFD program. That contention will be dismissed, free of the religious overtone.

Second, a false positive test result would injure the plaintiffs' reputation at NPPD and with the elders of their church. Such conjecture assumes the probability of a false positive reading and an unauthorized disclosure of such a result to the community. Moreover, such speculative conclusions as to the negative effect of submission to the drug testing programs on their respective reputations is an insufficient basis to find that a religious practice or precept is impermissibly burdened.

Third, the plaintiffs adhere to a hierarchy-of-powers doctrine in which a "lower power" accedes to the directives of a "higher power". At the apex of this hierarchical structure are the commandments of God, followed in descending order of priority by the United States Constitution, state law, and the NPPD regulations. The plaintiffs argue that the FFD program violates the United States Constitution, thus is an attempt by NPPD to "usurp a higher power". This challenge is not viable, since the plaintiffs fail to show what religious practice is burdened by the belief that NPPD's FFD program is not in accordance with the Constitution. Furthermore, insofar as this challenge depends upon provisions of the Constitution other than the Free Exercise Clause, it is redundant to overlay those provisions with the Free Exercise argument; to the extent that this challenge relies only upon the Free Exercise Clause, the challenge is not discrete from other Free Exercise challenges.

### 2. Applicable Legal Standard and Relevant Case Law

The first amendment guarantees the free exercise of an individual's chosen religion. The amendment "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut*, 310 U.S. 296, 303–304, 60 S.Ct. 900, 903–904, 84 L.Ed. 1213 (1940). The plaintiffs' salient religious objection concerns a burden on the exercise of religious acts. Since religious *practices* are not absolutely protected, a balancing of the competing interests is necessary.

The parties agree as to the relevant tripartite standard. First, the challenged regulation must actually burden, either directly or indirectly, the plaintiffs' religious practice. See *Tony and Susan Alamo*

*Foundation v. Secretary of Labor,* 471 U.S. 290, 303–306, 105 S.Ct. 1953, 1963–1964, 85 L.Ed.2d 278 (1985). Second, upon a showing that the governmental interference burdens the practice of the plaintiffs' religious beliefs, the state must advance an overriding interest necessitating the regulation. Third, the state must show that it has chosen the least restrictive means of achieving its compelling state interest. *Thomas v. Review Board,* 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981).

### A. Burden on Religious Practice

At the threshold, neither FFD program directly impairs the free exercise of religion and it is difficult to find that either FFD program indirectly infringes the plaintiffs' religious observances. It is clear from the testimonial evidence that the submission of urine samples per se is not religiously objectionable. The plaintiffs have submitted urine samples in conjunction with prior physicals. Rather, it is the inclusion within the FFD programs of a reference to the EAP which, according to the plaintiffs, incorporates by reference the EAP view of alcoholism as an illness. The FFD program, in isolation of the EAP, makes no mention of alcoholism.

The defendants, in turn, argue that such an attenuated argument is without merit because participation in the EAP program is voluntary; thus, the plaintiffs would only be associated with the policies set forth in the EAP program if they so chose. Such an argument has much facial as well as a "common sense" appeal; nevertheless, the first amendment requires further analysis of whether the plaintiffs religious practices are effectively burdened.

In *Thomas v. Review Board,* supra, the Supreme Court reviewed a religious objection made by a Jehovah's Witness who was initially employed in the production of sheet metal for industrial uses. The foundry subsequently closed and the plaintiff was transferred to a department which produced weapons. The plaintiff asserted that his religious beliefs prevented his partic- ipation in the production of weapons. The lower court found it inconsistent that the plaintiff opposed involvement in the direct manufacture of armaments, but not the indirect production of such weapons. The Supreme Court found that the plaintiff "drew a line and it is not for us to say that the line he drew was an unreasonable one." *Id.* at 715, 101 S.Ct. at 1430. The Supreme Court determined that this was not a case where a religious assertion was "so bizarre, so clearly nonreligious in motivation, as not to be entitled to protection under the Free Exercise Clause...." *Id.* Moreover, the Supreme Court reasoned that its task was to determine whether the plaintiff terminated his work because of an honest conviction that such work was forbidden by his religion.

■ First, this court must determine whether the plaintiffs have advanced a constitutionally protected religious practice. The discussion and findings of the Supreme Court in *Thomas* are instructive in the present case. There is no argument that the beliefs held by the plaintiffs are not sincere or religious in origin. The plaintiffs essentially argue that their religious practice of separation from heretical documents is burdened to the extent that the FFD programs actually test for the presence of disease, rather than for the presence of drugs. It is not necessary that this court agree with the plaintiffs' explanation of the nexus between the language of the FFD programs and the consequent violation of the free exercise clause. Rather, it is sufficient, for purposes of first amendment protection, that the plaintiffs sincerely believe that compulsory participation in the FFD programs contravenes their religious principles and practices. In *Thomas,* the Supreme Court made no attempt to divine when a religiously drawn line is unreasonable. Neither shall this court. This court remains mindful of the Supreme Court's admonition that a religious belief or practice "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id.* at 714, 101 S.Ct. at 1430.

Second, this court must determine whether the plaintiffs religious practice is burdened by the compelled participation in the FFD programs. As in *Thomas*, the plaintiffs are subject to termination "from the fact that the employment, once acceptable, became religiously objectionable because of changed circumstances." *Id.* at 718, 101 S.Ct. at 1432. There is no doubt that the plaintiffs believe that they are compelled to choose between fidelity to their religious precepts and continuation of their employment with NPPD. Thus, the facially neutral FFD program pressures the plaintiffs to forego their religious practices. Such compulsion, although indirect, is the very infringement which the free exercise clause protects against. *Id.* at 717, 101 S.Ct. at 1431–1432; *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965 (1963).

An argument contrary to the plaintiffs' is easy to construct: an illness—the word in the EAP, is illness, not disease—is, by common definition, "an unhealthy condition of the body or mind." *Webster's Third New International Dictionary.* That definition neither presupposes nor suggests the repository of responsibility for the condition's existence or its elimination. It neither assigns nor denies fault. Thus, one may choose his or her own other word or words to describe the condition further, be the word sin or disease or something else. Illness, then, can mean sin as easily as it can mean disease.

And, as every person entering treatment under EAP does so by choice, refusal to enter EAP while retaining belief in alcoholism as a sin—an illness that is an offense against God, if that be an acceptable definition of sin—no burden is imposed upon the exercise of one's religion by the FFD program.

But the plaintiffs *believe* that calling alcoholism an illness means calling it a disease and that calling it a disease means that it is not a sin and that saying it is not a sin contradicts the Bible, the written source of their religious beliefs. Their conclusion may rest on redefinitions, but that does not diminish their belief. One of their precepts is that they must be separated from heretical materials, and they conclude that participating in a program that offers a treatment that calls alcoholism a disease and not a sin would lash them to an heretical idea. They contend that that would amount to a false public representation by them that drunkenness is a disease and not a sin, thereby putting them at odds with God, the Bible, and other people of their church.

No amount of argumentation will dispel those beliefs and I have no inclination to try. But the FFD program does not burden those beliefs as such; it does burden, however, the practice of those beliefs, in light of plaintiffs' conviction that they must remain separated from documents and programs that adopt and offer concepts at odds with their own.

### B. Compelling State Interest

The Supreme Court has determined that, "[n]ot all burdens on religion are unconstitutional." The state may justify constraints placed on religious liberties by establishing that such limitations are essential to accomplishing an overriding governmental interest." *United States v. Lee*, 455 U.S. 252, 257–258, 102 S.Ct. 1051, 1055–1056, 71 L.Ed.2d 127 (1982).

A paramount interest advanced by the defendants is the health and safety of the public and NPPD employees. It goes without saying that a nuclear release affecting plant employees or the public at large would be disastrous. Exposure to unacceptable levels of radiation causes severe burns, internal disorders, and death. The defendants also argue a substantial interest in the maintenance of a positive public perception of plant safety. Additionally, the defendants argue that the public has a large economic interest in the facility functioning without incident. First, the plant cost approximately 500 million dollars and it would cost approximately three to five times that amount to replace. Second, the large monetary costs resulting from a maloperation are ultimately passed on to ratepayers. Third, the efficient operation of

CNS assures lower energy costs for ratepayers.

Although the defendants advance broad economic and safety concerns, the plaintiffs argue that the only relevant consideration is safety and safety must be defined in terms of nuclear safety as set forth in the USAR. Accordingly, the plaintiffs argue that the only pertinent safety concern is the prevention of a design basis accident resulting in a radiological release to the public. This court is not inclined to adopt the plaintiffs' narrow construction of the substantial interests implicated herein. Nevertheless, looking to the safety considerations alone, this court finds a compelling interest in the assurance of the safe operation of the nuclear facility.

The plaintiffs essentially argue that 10 C.F.R. Parts 0 to 199 and the USAR mandate that CNS withstand all conceived postulated accidents (design basis accidents with a resultant release of unacceptable levels of radiation to the public). Numerous redundant systems and equipment are in place to prevent the occurrence of a release. Moreover, the plaintiffs argue, USAR Appendix F mandates that, in the event of a maloperation or equipment failure, a release be kept within acceptable levels, and since CNS is in compliance with such regulations, operator impairment, regardless of its origin, is postulated as an accident which CNS is designed to withstand. Thus, the use of drug testing is unnecessary, as operator failure is an eventuality that has been considered and guarded against in the design of the facility.

It is a chilling thought to presume that safety concerns relevant to a nuclear plant are in no need of constant update and re-evaluation. Fortunately, such is not the perspective of NPPD, as the defendants established that the design criteria are continually re-evaluated and revised. There have been over 1000 changes, large and small, to the design since CNS was built. The addition of the FFD program furthers the ongoing process of securing public safety.

■ Nonetheless, assuming it could be conceded that all possible accidents are presently contemplated within the postulated accidents, this does not lay to rest the need for effective reactions on the part of all relevant personnel in the event of an accident. First, the defendants argue that qualified operators must remain aware and observant and must react promptly and accurately to mitigate damages resulting from an accident, maloperation, or sabotage. Second, during those instances when a safety related piece of equipment is out of use, it is particularly important that a controller monitor the backup equipment. Third, an individual with the requisite time, intent, and knowledge could jeopardize the safety of the plant and the public. The defendants point out that the accident which occurred at the nuclear plant at Three-Mile Island involved human error. The defendants argue, and I agree, that minimization of the risks inherent in the operation of a nuclear facility require proper maintenance, operation, and design. It is beyond doubt that NPPD has a compelling interest in assuring the safe operation of CNS.

The plaintiffs also argue that neither the NRC nor the USAR requires FFD programs. The plaintiffs contend that if the NRC were to determine an FFD program to be in order, the NRC would prescribe such a program through its rulemaking authority. It is true that the NRC, as yet, has not promulgated a rule setting forth the requirements necessary for FFD programs. It is also true that such a rule will be forthcoming should licensees fail to implement their own FFD policies. This court's earlier discussion of the status of an NRC rule regarding FFD programs demonstrates that this argument is without merit.

C. The Least Restrictive Alternative

■ Where the state regulates conduct and the purpose and the effect of so doing is to advance the state's secular goals, the regulation is valid despite its indirect burden on religious observances, unless the state may accomplish its purpose by means

which do not impose such a burden. *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961). I find that compulsory participation in drug testing is the least restrictive means of assuring the continued safe operation of CNS. The plaintiffs argue that an exception is constitutionally required for them and for others similarly situated. This court finds otherwise. Accommodating the plaintiffs exercise of religion will unduly interfere with the fulfillment of the governmental interest. See *United States v. Lee*, supra, 455 U.S. at 259, 102 S.Ct. at 1056.

In *Braunfeld v. Brown*, supra, the Supreme Court reviewed the constitutionality of a state statute which barred retail sale on Sunday. The plaintiffs opposed the statute because as members of the Orthodox Jewish faith they were precluded from working from nightfall on Friday to nightfall on Saturday. Consequently, the inability to work on Sunday, the plaintiffs argued, created a serious economic hardship.

The Supreme Court found that the state statute indirectly burdened the plaintiffs religious observances; however, the state is empowered to provide a weekly respite from all labor and to set one day of the week aside for rest. Significantly, the Supreme Court found that the state was not constitutionally required to create an exemption for individuals whose religion recognizes a day other than Sunday as a day of rest. The Supreme Court stated that "reason and experience teach that to permit the exemption might well undermine the State's goal...." The Court was also influenced by the factor that allowing such an exception might well work to the economic disadvantage of those businesses that remain closed on Sunday. Such a competitive advantage could tempt some businessmen to assert religious convictions falsely that would necessarily draw the state into inquiries as to the sincerity of the religious belief. Such an investigation could "itself run afoul of the spirit of constitutionally protected religious guarantees." *Id.*, 366 U.S. at 609, 81 S.Ct. at 1149.

In *Sherbert v. Verner*, supra, the plaintiff was denied unemployment compensation because it was determined that she lacked good cause to refuse the employment offered to her. The plaintiff was discharged for her refusal to work on Saturday, the Sabbath day of her faith. The Supreme Court found that disqualification for benefits imposed a burden of the plaintiff's free exercise of religion because the defendants forced the plaintiff to chose between following her religious precepts or forfeiting benefits. Such a choice infringes religious liberty.

The Supreme Court distinguished *Braunfeld v. Brown*, supra, because (1) no strong state interest, such as providing a uniform day of rest, existed to justify the burden and (2) an exception for Sabbatarians would render the entire statutory scheme unworkable. *Id.*, 374 U.S. at 408–409, 83 S.Ct. at 1796–1797. The Supreme Court dispensed with the argument that the filing of claims feigning religious objections to Saturday work would dilute the unemployment compensation fund because such a contention was not raised before the lower court and even if such a challenge was raised, there was no evidence in the record to support such a contention.

In *United States v. Lee*, supra, a member of the Amish sect challenged, on religious grounds, the receipt of public insurance benefits and the payment of taxes to support public insurance funds. The Amish believe that it is sinful not to provide for their elderly and needy; therefore, they are religiously opposed to mandatory participation in the national social security system. The Supreme Court accepted the plaintiff's contention that both payment and receipt of social security benefits are forbidden by the Amish faith; consequently, compulsory participation in the social security system interfered with free exercise of religion.

Additionally, the Supreme Court found that the government interest in assuring mandatory and continuous participation in and contributions to the social security system was compelling. The remaining, and

for the purposes of this case the most significant, issue was whether accommodating the Amish belief unduly interfered with the fulfillment of the governmental interest. The Supreme Court reasoned that:

> "To maintain an organized society that guarantees religious freedom to a great variety of faiths requires that some religious practices yield to the common good. Religious beliefs can be accommodated ... but there is a point at which accommodation would 'radically restrict the operating latitude of the [government]' ...
>
> Because the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax." (citations omitted)

*Id.*, 455 U.S. at 259–260, 102 S.Ct. at 1056–1057.

■ In light of the foregoing analyses, I am persuaded that an exemption from mandatory participation in the NPPD fitness for duty program is not constitutionally prescribed. This case is most comparable to the circumstances in *United States v. Lee,* supra, and *Braunfeld v. Brown,* supra, since an exception to the drug-testing scheme would render it ineffective. This case is distinguishable from *Sherbert v. Verner,* supra, because the likelihood of fraudulent claims has been advanced and argued persuasively.

First, sufficient evidence was submitted to show a real and a substantial likelihood of individuals asserting false religious convictions to avoid submitting to the FFD programs. The medical experts for both parties indicate that a chemical abuser would go to great lengths to conceal his or her use. The plaintiffs expert witness, Harold Mulford, stated that it is not unreasonable to assume that a drug user would switch or adulterate his or her urine sample. It is at least equally likely that a chemical abuser will attest to false religious tenets in an affidavit to prevent detection.

Second, the defendants introduced evidence to establish the escalating use of drugs. Peter Bensinger, the former Administrator of the Drug Enforcement Agency (DEA), testified that the rise is indicative of the present increase in the level of drug purity combined with a decrease in selling price. Moreover, in the geographical area of this court the DEA staff has increased from two to five agents within the last year. Such a substantial increase in personnel is reflective of the availability and the sale of drugs within this region.

Third, the evidence indicates the necessity for deterrence and detection given the pervasive use of drugs. Both Mulford and Bensinger testified that it is not the severity of the punishment, but the certainty of detection, that provides the greatest deterrent effect. Moreover, the threat of losing a job is a strong deterrent.

Proffered Lesser Restrictive Alternatives

■ The plaintiffs suggest that lesser restrictive alternatives are available to NPPD. First, the plaintiffs contend that the submission of an affidavit attesting to the affiant's abstinence from alcoholic beverages and illegal drugs is a reasonable substitute for drug testing. However, it must be kept in mind that expert witnesses for the plaintiff and the defendant indicated, and this court has no reason to doubt, that a chemical abuser "would do just about anything" to avoid detection. Recognizing the setting in which the drug screening occurs, the pervasiveness of drug use, the high probability of fraudulent religious objections, and the need for an effective means of deterring chemical use, I find that the use of such affidavits would defeat NPPD's objective of assuring fitness for duty and the safe operation of CNS.

Second, the plaintiffs argue that the defendants failed to follow the grievance procedure outlined in the Employee Handbook; consequently, NPPD ignored an additional lesser restrictive alternative. The testimonial evidence indicates that it is the employee who must initiate the grievance process

in accordance with the procedure outlined in the Employee Handbook. The evidence shows that the plaintiffs failed to pursue this remedy; thus, they may not hold defendants accountable for their oversight.

Third, the plaintiffs assert that escorted access into the vital areas is a feasible alternative. Escorted access requires that other badged employees (those authorized for unescorted access) be called from their duties to accompany nonbadged employees. Such a method of entrance into the protected area does not reasonably assure that the escorted employee is not under the influence of drugs/alcohol. The purpose of the drug screening is to determine impairment where no observable signs are present. Moreover, the use of escorted access is subject to the same perils discussed in the submission of an affidavit in lieu of drug testing, as well as the considerable displacement of employee resources.

Fourth, the plaintiffs maintain that it is the responsibility of the defendants to transfer the plaintiffs to a position which does not require either drug testing or badged access to CNS. The evidence shows that the manager of the Human Resources Department, R.L. Walgren, "knew of no supervisory engineering positions available" and informed Rushton that the plaintiffs should periodically check the NPPD board which posts job openings. Exhibit # 17. If an opening became available for which the plaintiffs were qualified, they would be considered with all other candidates.

On November 6, 1986, Rushton was informed of the creation of a supervisory position in structural engineering by NPPD. Exhibit # 25. Rushton indicated at trial that his background is not appropriate for the position and Rushton expressly told NPPD that he was not interested in a position that does not "present any career path potential." Exhibit # 26. The testimony is that the plaintiffs are interested in only those transfers which provide a commensurate salary level and growth potential. Only one such job became available; it requires unescorted access. There is no evidence to show that a job that the plaintiffs would find acceptable, for which the plaintiffs are qualified, and that does not require unescorted access to CNS exists. Under such circumstances, the defendants cannot be compelled to create agreeable positions for the plaintiffs.

Fifth, the plaintiffs propose that NPPD "wait and see" how many employees actually object to the drug test on religious grounds and the degree of administrative inconvenience created by escorted access of religious objectors to the protected area. Exhibit # 13. Such a proposition is totally ineffectual in reasonably assuring the safe operation of CNS.

Sixth, the plaintiffs propose that the defendants limit the applicability of the drug screening to those employees requiring access to vital areas. The usefulness of this alternative is questionable as the plaintiffs testified that they perform some job functions within vital areas. Moreover, this court is mindful that the NRC, the regulatory agency charged with supervising the safety of nuclear facilities, deems it necessary that all personnel with unescorted access to the protected areas, not just the vital areas, undergo drug testing. Considering all these relevant factors, limiting participation in the drug testing to only those individuals seeking entrance to vital areas diminishes the safe operation of the facility.

I am persuaded, given the circumstances of this case, that an exemption based on religious objections undermines the purpose of the drug testing scheme. Nothing less than compulsory participation, applied uniformly to all employees with unescorted access to CNS, reasonably assures fitness for duty. Thus, mandatory participation in the FFD program is the least restrictive alternative available to assure the safe operation of CNS.

### III. FOURTH AMENDMENT CHALLENGE

#### 1. Relevant Legal Principles

At the threshold, it is clear that a urinalysis constitutes a search and seizure within

the meaning of the Fourth Amendment. *Spence v. Farrier*, 807 F.2d 753, 755 (8th Cir.1986). The relevant inquiry for this court is to determine whether the search is reasonable. Whether a search and seizure is reasonable depends upon the context within which the search takes place. The reasonableness standard requires a balancing of the individual's legitimate expectations of privacy and personal security against the government's need for the search. *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 741, 83 L.Ed.2d 720 (1985).

In most cases, the prerequisite to a reasonable search and seizure is the existence of a warrant based on probable cause. A warrantless search, in some instances, may be executed where probable cause is present. However, there are instances where a search is permissible in the absence of a warrant and probable cause. The Supreme Court has recognized circumstances in which the public interest is best served by a standard of reasonableness that stops short of probable cause. In *New Jersey v. T.L.O.*, supra, the Supreme Court reasoned that:

> " '[P]robable cause' is not an irreducible requirement of a valid search. The fundamental command of the Fourth Amendment is that searches and seizures be reasonable, and although 'both the concept of probable cause and the requirement of a warrant bear on the reasonableness of a search, ... in certain limited circumstances neither is required.' " (citations omitted).

*Id.* at 340, 105 S.Ct. at 743.

The United States Supreme Court determined in *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979), that:

> "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."

The task befalling this court is to determine whether the need for compulsory drug testing by NPPD outweighs the invasion occasioned by such a search.

### 2. Applicability of Warrantless Administrative Search Standard

In *Shoemaker v. Handel*, 795 F.2d 1136 (3rd Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986), jockeys challenged the regulations adopted by the New Jersey Racing Commission permitting the State Racing Steward to direct any official, jockey, trainer, or groom to submit to a breathalyzer and urine test to detect alcohol or drug use. The Third Circuit Court of Appeals held that the administrative search exception applies to warrantless breath and urine testing of employees in the heavily regulated horse-racing business.

The Third Circuit reasoned that the warrantless administrative search is justified where a strong state interest exists in conducting an unannounced search and the pervasive regulation of the industry has reduced the justifiable privacy expectation of the individual searched. Both prongs of this two-part test exist in the case at hand. In *Shoemaker*, the Third Circuit found that the state had a strong interest in "assuring the public of the integrity of the persons engaged in the horse racing industry." *Id.* at 1142. Not only does such a strong interest in maintaining public confidence exist in the present case; NPPD has an even greater interest in ensuring the safety of the public, NPPD employees, and the CNS plant facility.

Here, as in *Shoemaker*, the plaintiffs have a diminished expectation of privacy given the nature and place of their employment. As a licensee, NPPD is subject to a pervasive and comprehensive regulatory scheme. The NRC requires NPPD to search each individual entering the CNS protected area for firearms, explosives, and incendiary devices by the use of mechanical

detection equipment. 10 C.F.R. § 73.-55(d)(1). Each hand-carried and delivered package is searched. 10 C.F.R. § 73.-55(d)(2) and (d)(3). Any vehicle seeking entrance to CNS is searched. 10 C.F.R. § 73.55(d)(4). Moreover, all entrants are subject to random pat-down searches.

After an individual is admitted entrance, surveillance continues through the use of closed circuit television, micro-wave transmission, and personal observation. The testimonial evidence indicates that security guards continually patrol the protected area. Moreover, the NRC routinely sends announced and unannounced personnel to CNS for inspection purposes. During the course of such inspections, it is not uncommon for a NRC representative to question CNS employees. Given all the foregoing considerations, I find that the plaintiffs have a diminished expectation of privacy while within the confines of CNS. Thus, I find that the administrative search exception is applicable to this case.

In *Shoemaker*, the Third Circuit was specifically confronted with the constitutionality of the random selection method of urine testing. The court found the following factors persuasive: (1) the urine testing is compelled by an administrative scheme, (2) the state steward has no discretion as to the individual chosen for the urine testing, and (3) the selection of the individual is made by lottery. The court ultimately held that random selection of those jockeys subject to urine testing was constitutionally permissible. *Id.* at 1143.

The Eighth Circuit Court of Appeals recently applied the rationale of the *Shoemaker* opinion to the issue of whether a correctional institution may constitutionally compel its employees to undergo, among other searches, a urine test. The Eighth Circuit found that *uniform* or systematic *random* selection of an employee for a urinalysis is reasonable where the employee has regular contact with prisoners housed in medium to maximum security prisons. The court essentially concluded that the state's paramount interest in prison security outweighed the guards' dimin-

ished expectations of privacy. *McDonell v. Hunter*, 809 F.2d 1302, 1308–1309 (8th Cir. 1987). Thus, the intrusion imposed on the plaintiffs' privacy by compulsory submission to annual and random drug screening was reasonable within the meaning of the fourth amendment.

## IV. FOURTEENTH AMENDMENT CHALLENGE

### 1. Substantive Due Process

It appears that the plaintiffs argue a substantive due process claim. Substantive due process provides a shield against arbitrary and capricious deprivations of liberty. The evidence at trial does not establish that the testing procedures of NPPD are so susceptible to error that the plaintiffs are realistically subjected to the risk of false-positive readings. Rather, the evidence shows that the EMIT procedure utilized in conjunction with such confirmatory tests as gas chromatography/mass spectrometry is accurate and reliable. Moreover, the Eighth Circuit has reviewed the use of the EMIT in combination with confirmatory testing procedures in two instances and determined that the "EMIT tests have been found sufficiently reliable to meet the requirements of the due process clause." *Spence v. Farrier*, supra, at 756; *McDonell v. Hunter*, supra, at 1309.

### 2. Procedural Due Process

The plaintiffs raise procedural due process objections in varying contexts. First, the plaintiffs argue that the FFD program provides for "forced rehabilitation" in those instances where an individual tests positive for the presence of drugs. The plaintiffs further state that, "[i]f an employee refuses to be incarcerated in a rehabilitation hospital, he will be fired." *Plaintiffs' Brief*, at 32. The plaintiffs are apparently contending that those individuals who test positive are compelled to participate in the employee assistance rehabilitation program without due process of law. Such a contention is without merit given the clearly voluntary nature of the EAP program.

Second, the plaintiffs argue that the lack of or deviations from a defined chain-of-custody procedure violates the guarantee of due process. The plaintiffs essentially argue that the original FFD program contains insufficient safeguards to prevent a false-positive test. At the time the specimen is collected, the plaintiffs argue, there is ample opportunity for the specimen to be switched. The plaintiffs argue that the sealed envelope containing the specimen may lie in an "out" basket awaiting mail collection for several hours. Again, such an event provides an opportunity for the switching or tampering with a urine sample. The plaintiffs also allege an absence of a chain-of-custody at the testing laboratory. The plaintiffs surmise that samples are subject to adulteration and mix-up at the laboratory.

The plaintiffs' essentially seek from this court a declaration as to the minimum procedural safeguards the Constitution affords an individual subjected to drug testing. The plaintiffs have presented no proposed standard and the circumstances of this case do not require that this court fashion such a test. Whatever may be the constitutionally prescribed minimum threshold of due process, the plaintiffs have shown neither a harm suffered nor any real likelihood of suffering harm due to the allegedly ill-defined chain-of-custody procedures.

The plaintiffs are not affected by the possibility that the procedures provide an individual with the opportunity to substitute his/her own urine sample for a procured clean sample. Rather, the plaintiffs harm lies in the possibility that the procedure provides an opportunity for a third party to tamper with the plaintiffs' samples such that a false-positive reading results. The plaintiffs have advanced no evidence to suggest that such adulteration has occurred or that the plaintiffs are in jeopardy of testing positive because of allegedly inadequate security precautions. Rather, the evidence shows that since the implementation of the FFD program no positive or false-positive test has occurred. Moreover, the new NPPD policy includes an in-depth and comprehensive chain-of-custody procedure which appears to remedy the alleged flaws of the earlier program.

Additionally, the opinion in *Spence v. Farrier*, supra, at 6, is instructive in this regard. The Eighth Circuit noted that:

"Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, the margin of error is insignificant in light of the institutional goals. States need not implement all possible procedural safeguards against erroneous deprivation of liberty when utilizing results of scientific testing devices in accusatory proceedings."

Third, the plaintiffs argue that "NPPD is trying to remove their freedom to practice their religious beliefs without due process of law." *Plaintiffs' Post Trial Brief*, at 22. The plaintiffs further argue that they were denied a hearing and that "there was no serious attempt to provide due process consideration to the Plaintiffs' religious free exercise rights under the First Amendment to the United States Constitution." *Id.* at 21–22. The plaintiffs misapprehend the protections afforded by the due process clause. The fourteenth amendment provides in relevant part that:

"... nor shall any State deprive any person of life, liberty, or property, without due process of law...."

U.S. Const. amend. XIV, § 1. The due process clause safeguards life, liberty and property. Religion is not designated within the limited range of interests except to the same extent that all Bill of Rights guarantees are made applicable to the states through the fourteenth amendment, because it is uniquely entrusted to the protections of the first amendment. This is no more than an attempt by the plaintiffs to resurrect free exercise arguments in the guise of due process challenges.

Fourth, the plaintiffs argue that both programs are violative of due process because upon a finding of a positive test result the tested employee has two options—to participate in the employee assistance program or face disciplinary action.

It appears in this instance that the plaintiffs argue that their employment positions are subject to termination without due process of law. However, the plaintiffs made no showing, by such means as an employment contract or applicable statute, that they possess a protected property right in continued employment. Assuming, nonetheless, that a protected property interest exists, this court must determine whether the plaintiffs received notice and an opportunity to respond. *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 540–546, 105 S.Ct. 1487, 1492–1496, 84 L.Ed.2d 494 (1985).

The evidence indicates that on December 18, 1985, the plaintiffs and two other NPPD employees requested a hearing of G.S. McClure and other appropriate managers regarding their constitutional objections to the fitness for duty program. Exhibit # 4. On December 24, 1985, G.S. McClure forwarded the plaintiffs written request to Gene D. Watson, general counsel for NPPD, seeking a legal analysis of the fitness for duty program. Exhibit # 31. Lostroh met with McClure on two occasions in March, 1986, regarding the FFD programs. Also, during March, 1986, the plaintiffs met with R.L. Walgren, the Manager of the Human Resources Department, regarding objections to the program, alternatives to submission to the test, and the possibility of other employment.

On March 12, 1986, the plaintiffs met with L.G. Kuncl, the Vice-President of the Nuclear Power Group (the highest ranking officer in the Group), and J. Pilant to discuss lesser restrictive alternatives. Kuncl agreed to review the alternatives presented and suggested that each party contemplate other alternatives. Kuncl retained a written memorandum regarding the meeting. Exhibit # 59. Kuncl testified that he notified NPPD management of the plaintiffs' objections. Lostroh responded to Kuncl's request for additional alternatives with a written list of proposals. Exhibit # 33. It is interesting to note that one of Lostroh's suggestions included automatic termination of an employee where "abundant incontrovertible evidence" is produced of drug use; no provision is made for a due process hearing.

Donald Schaufelberger, President of NPPD, testified that he was made aware of the plaintiffs' concerns in March, 1986. On March 27, 1986, a meeting was held by management to discuss the allegations of drug use at CNS, revisions to the present FFD program, the religious objections posed by the plaintiffs, and the lesser restrictive alternatives offered by the plaintiffs. It was decided that random and annual testing methods were in order and that the program should require testing of outside contractors and NRC personnel. It was concluded that adoption of the plaintiffs' proposals was not in the best interests of NPPD. The plaintiffs were informed of the defendants' decision, at the latest, by April 7, 1986. Exhibit # 36.

■ I find that the plaintiffs received a meaningful opportunity to present their religious objections and alternative proposals to the FFD programs to NPPD management. The plaintiffs were effectively "heard" prior to the time they were required to submit to the drug testing and prior to any ensuing termination procedures for failure to submit to the testing. The plaintiffs received all the process they are due.

## V. FIFTH AMENDMENT CHALLENGE

The plaintiffs argue that the drug testing program is violative of the fifth amendment's protection of the right against self-incrimination. In *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), the Supreme Court determined whether the withdrawal of blood and the admission into evidence of the analysis violated the fifth amendment privilege. The same rationale articulated by the Supreme Court in *Schmerber* is equally applicable to this case.

■ In *Schmerber*, the Supreme Court found that requiring the plaintiff to submit to the withdrawal and chemical analysis of the blood sample constituted an attempt to compel evidence of criminal guilt. Never-

theless, the Supreme Court reasoned that no infringement of the fifth amendment existed because blood test results are "neither [the plaintiff's] testimony nor evidence relating to some communicative act or writing by the [plaintiff]." *Id.* at 765, 86 S.Ct. at 1833. The chemical analysis results of the plaintiffs' urine are not evidence of a testimonial or communicative nature.

Additionally, the plaintiffs contend that the fifth amendment is violated by the inclusion within the consent forms of a provision requesting the itemization of all medications taken within the last thirty days. Although such a signed form does meet the requirement of a written communication, the argument, nevertheless, is without merit. The use of medication, be it over-the-counter or prescription, is not a criminal offense. Thus, evidence of the use of medication does not compel an employee "to be a witness against himself." See *Schmerber v. California*, supra, at 761, 86 S.Ct. at 1831.

## VI. NINTH AMENDMENT CHALLENGE

■ Lastly, the plaintiffs assert a violation of the ninth amendment right to privacy. The plaintiffs argue a right of privacy in the act of urination. The evidence shows that an employee's act of urination is not witnessed; thus, this argument is without merit. The plaintiffs also advance a right of privacy in the information disclosed within the signed consent form. This argument fails to establish a cognizable claim since the plaintiffs have not shown any unauthorized release of the information nor any likelihood of such an event.

Additionally, the plaintiffs contend that there is a right of privacy in the medical information contained within the urine sample. In *Shoemaker v. Handel*, supra, the Third Circuit Court of Appeals recognized such a right of privacy. The principal concern is the unauthorized disclosure of the medical information. In *Shoemaker*, the Third Circuit found that the racing commission's access to the information was justi-

fied, given its interest in racing integrity. By analogy, the plaintiffs' argument that NPPD is not entitled to such information fails.

At trial, the plaintiffs advanced fears that NPPD would disclose the results of the urinalysis to state officials for criminal prosecution. Assuming that such a disclosure to law enforcement officials is a violation of the ninth amendment, the plaintiffs have shown no such release in the past nor any likelihood that the results will be disclosed in the future. Moreover, NPG Directive 2.3 indicates that documentation of positive drug and alcohol tests will be retained in the confidential files of the Human Resources Department. There is no evidence to indicate that NPPD intends to disclose the confidential information contained within the urine specimen.

## VII. PENDENT JURISDICTION

■ Under the rationale of *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) I conclude that the claims asserted under Nebraska law should be resolved in this case. They arise out of the same set of facts as the federal claims and I see no virtue in separating them out for trial in some other court. The facts are before me and the principles of law are essentially the same as the principles involved in the federal claims.

The plaintiffs have asserted pendent jurisdiction claims under the following provisions of the Constitution of the State of Nebraska:

1. Article I, Section 1 which provides: "All persons are by nature free and independent, and have certain inherent and inalienable rights, among these are life, liberty and the pursuit of happiness. To secure these rights, and the protection of property, governments are instituted among people, deriving their just powers from the consent of the governed."

2. Article I, Section 3 which states:

"No person shall be deprived of life, liberty, or property, without due process of law."

3. Article I, Section 4 which states: "All persons have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences. No person shall be compelled to attend, erect or support any place of worship against his consent, and no preference shall be given by law to any religious society, nor shall any interference with the rights of conscience be permitted. No religious test shall be required as a qualification for office, nor shall any person be incompetent to be a witness on account of his religious beliefs; but nothing herein shall be construed to dispense with oaths and affirmations. Religion, morality, and knowledge, however, being essential to good government, it shall be the duty of the Legislature to pass suitable laws to protect every religious denomination in the peaceable enjoyment of its own mode of public worship, and to encourage schools and the means of instruction."

4. Article I, Section 7, which provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

5. Article I, Section 26, which provides: "This enumeration of rights shall not be construed to impair or deny others, retained by the people, and all powers not herein delegated, remain with the people."

These constitutional provisions are no different, as far as I can tell from the related constitutional provisions of the United States Constitution. No cases have been cited by the parties to indicate any difference in outcome under the Constitution of the State of Nebraska from the United States Constitution. Accordingly, I make only brief reference to the Constitution of the State of Nebraska.

Article I, Section 1 of the Constitution of the State of Nebraska is an equal protection provision. The briefs of the parties seem to ignore that provision and I am inclined to think it is for good reason. The discrete group to which the drug testing of NPPD applies is the persons who have unescorted access to protected areas of CNS. There is a rational basis for treating those persons alike and treating them differently from other people because of the additional risk of danger from their presence.

Article I, Section 3 is the same as the due process clause of the Fourteenth Amendment of the Constitution of the United States and I find no reason to treat the plaintiffs' claim differently than I have treated it under the Fourteenth Amendment discussion.

Article I, Section 4 of the Constitution of the State of Nebraska is different in wording from the First Amendment to the Constitution of the United States, but I cannot find in the wording any difference in meaning as it may apply to this case.

Article I, Section 7 of the Constitution of the State of Nebraska does not differ from the provision of the Fourth Amendment to the Constitution of the United States and my discussion regarding the latter is adequate to cover the state Constitution as well.

Article I, Section 26 of the Constitution of the State of Nebraska cannot be interpreted any more broadly, it seems to me than that it recognizes a right of privacy. The discussion in the memorandum of decision relating to the Ninth Amendment of the Constitution of the United States sufficiently deals with this claim.

Accordingly, I conclude that all claims must be dismissed and judgment entered for the defendants.