POLICEMEN'S BENEVOLENT ASSOCIATION OF NEW JERSEY, LOCAL 318 and Edmund Giordano, Individually and as President of the Policeman's Benevolent Association of New Jersey, Local 318, Plaintiffs,

v.

TOWNSHIP OF WASHINGTON (GLOUCESTER COUNTY) a municipal corporation under the laws of New Jersey, and John Robertson, Mayor, Defendants.

Civ. A. No. 86–3525.

United States District Court, D. New Jersey.

Oct. 8, 1987.

Ralph H. Colflesh, Moorestown, N.J., for plaintiffs.

Joseph A. Alacqua, Turnersville, N.J., for defendants.

## OPINION

RODRIGUEZ, District Judge.

### FACTS AND PROCEDURAL HISTORY

This case was brought before the court pursuant to 42 U.S.C. § 1983. The plaintiffs claim that the constitutional rights of Washington Township's police officers, whom plaintiffs represent, will be violated if the Township's proposed drug-testing plan for municipal employees is put into effect.

The issues in this matter represent a juxtaposition of two vital societal concerns: The need to ensure that our public servants, in this case police officers, are free from the modern scourge of illegal drug abuse; versus the right of the individual to be protected from unreasonable searches aimed at detecting evidence of such abuse. This opinion presents the court with an opportunity to delineate the constitutional boundaries of these potentially conflicting societal interests.

On August 4, 1986, President Ronald Reagan called upon all levels of government to develop plans to ensure drug-free workplaces in our nation. On August 5, 1986, the Mayor of Washington Township, John W. Robertson, Jr., inspired at least in part by the President's call, issued a memorandum directing that all employees of the Township would be subject to mandatory drug testing. There were no guidelines issued with respect to the proposed testing at that time.

On September 12, 1986, the Policemen's Benevolent Association of New Jersey, Local 318 and its president, Edmund Giordano, filed suit on behalf of the police officers of Washington Township. The Township, Mayor Robertson and the Township Council were named as defendants. The plaintiffs asked the court to declare the planned drug testing unconstitutional and to enjoin the Township from undertaking such testing with respect to police officers. The plaintiffs also sought temporary restraints against the defendants while the matter was under review.

The court initially granted temporary restraints and ordered the defendants to appear and show cause why a preliminary injunction should not be granted to the plaintiffs. The parties appeared in court on September 19, 1986. At that time, the

Township indicated that no testing of police officers had taken place and that none would take place until guidelines were formulated and the court had an opportunity to review those guidelines. Based on those representations, plaintiffs' application for a preliminary injunction was denied. The temporary restraints were dissolved on October 8, 1986.

On October 6, 1986, the defendants answered the plaintiffs' allegations and counterclaimed for attorney's fees pursuant to 42 U.S.C. § 1988.

Pretrial discovery was conducted under the supervision of Judge Jerome B. Simandle. On February 25, 1987 the defendants submitted the "Revised Employee Drug Testing Program of the Township of Washington," (Plan) which is the plan under review here. The parties have since indicated that no genuine issue of material fact remains to be decided and that this dispute can be resolved by motion. The case is presently before us on cross-motions for summary judgment on the issue of whether certain aspects of the defendant's proposed drug testing plan should be permanently enjoined.

The plaintiffs have stipulated that they are only challenging the constitutionality of the following aspects of the proposed plan: those aspects calling for the random testing of police officers; those aspects which might authorize the mass-testing of the entire police force; and those aspects which would permit testing as part of pretextual physical examinations which are not bona fide medical examinations given in the ordinary course of business and as a matter of the Township's policy for its police officers.

The plaintiffs have also stipulated to dismiss the Township Council as a defendant. In return, the defendant Township Council has withdrawn the counterclaim in which it sought attorney's fees.

## THE PLAN

The stated purpose of the proposed plan is "to establish uniform policies and procedures to govern the administration of a screening process to test and control unauthorized use of illicit drugs among all sworn and civilian personnel of the Township of Washington." Plan, section 1, pg. 1. The introductory section indicates that the policy "takes cognizance of the rights inherent in each individual of the Township under the Constitution of the United States of America and the State of New Jersey." Plan, section 2, pg. 1. Of course, it is the purpose of this opinion to determine whether or not the policy embodies a sufficient cognizance of constitutional rights.

The plan proposed by Washington Township would permit the defendant to initiate drug testing of its employees in a variety of ways. There are two "base methods" listed for the detection of illegal drug use by Township employees. The first is "[t]esting of those individual employees where facts are sufficient to constitute reasonable suspicion ..." of illegal drug use. The second is by way of a "universal random urinalysis procedure." Plan, section 3, pg. 2. In addition to these "base methods," the policy also states that all municipal employees will be required to have annual physical examinations which shall include a urinalysis drug test. There is a reservation of the right to require additional "regularly scheduled and announced" medical examinations of employees in certain municipal departments. Plan, section 4, pg. 3. The plaintiffs believe that this reservation would give the Township the power to schedule drug tests in addition to those conducted as part of the annual "medical examination." Finally, the policy requires all municipal job applicants to sign consent forms in which they agree to submit a urine sample for drug testing. An applicant's refusal to provide such a sample or the detection of drugs in a sample will result in the rejection of the employment application.

Random selection of employees to be tested would be accomplished by a computer programmed by an independent contractor. The selected subject would be notified of the impending drug test "just prior to transport to the testing location." Plan, section 8, pg. 5. The employee would also

be informed at that time of the specific drugs to be tested for.

The following procedure would apparently apply to all drug testing, whether initiated by random selection or otherwise: Testing will take place in a "clean and sanitary location" equipped with washing facilities. Plan, section 10, pg. 7. The selected employee must complete a medical questionnaire which clearly describes "all drugs, both prescription and non-prescription, ingested during the past 3 days." Plan, section 8, pg. 5.

The employee must thoroughly wash his or her hands and fingernails and "deliver the urine sample under the direction of the medical or laboratory technician." *Id.* The employee must submit a required minimum amount of urine in an approved container. The urination would take place in "private," unless there is a reasonable suspicion that the subject will tamper with the sample in some way. Plan, section 12, pg. 8. However, the urination will in any event take place under the "general supervision of [a] medical laboratory technician." The laboratory technician will supervise "all aspects of obtaining, marking and packaging of individual urine samples...." Plan, section 10, pg. 6.

"At all stages of the urine-sampling procedure the employee will be expected to follow each instruction of the testing supervisor." Plan, section 8, pg. 5. The employee will be assigned a number which will correspond to a number on the sampling container. This process is designed to assure anonymity. The employee must also sign documentation verifying that the number on the sample corresponds to the number they have been assigned.

The Township is to specify which specific illegal substances it wishes to test for in each case. The testing laboratory shall be responsible for maintaining a proper chain-of-custody of each sample. Each sample would undergo two different tests. The plan tentatively indicates that the first test shall employ a thin-layer chromatography process. The second test shall employ either "enzyme immunoassay, gas liquid chromatography, [or] mass spectrometry."

Plan, section 13, pg. 8. The testing laboratory would also preserve an aliquot sample of the urine which the subject employee may use to conduct a confirmatory test at the same laboratory, under the supervision of experts chosen by the employee.

Drug testing would not be conducted for purposes of criminal prosecution. Employees testing positive for drugs would be referred to an Employee Assistance Program for "assessment, counseling, and referral for treatment or rehabilitation as appropriate." Plan, section 17, pg. 10.

However, the Township reserves the right to dismiss or discipline anyone found to be using drugs. The only drug users who may not be disciplined or fired are those employees who come forward and volunteer to be drug tested during the sixty day period prior to the implementation of the Township's mandatory testing program. To avoid termination or other disciplinary action, such persons must also volunteer the fact that they are illegal drug users, obtain help through the Employee Assistance Program (EAP), and remain drug-free thereafter. Any employee who refuses rehabilitation and uses illegal drugs a second time will be terminated.

The proposed plan includes an education program which would, among other things, educate employees about the extent of the drug problem facing society; the programs in effect to combat this problem; the dangers of drugs; and the signs of drug abuse which can be detected in fellow employees. Supervisory personnel will also receive training so that they will be able to determine when a reasonable suspicion exists that an employee is using drugs.

Employees will be notified sixty days in advance that the drug testing program is about to go into effect. During that period employees are encouraged to voluntarily come forward if they are using illegal drugs. All job applicants would be informed that drug testing is a condition of employment.

The proposed plan has a severability clause which states that "if any of its provisions shall be held unconstitutional or otherwise invalid by any court of compe-

tent jurisdiction, the decision of such court shall not affect or impair any of the remaining provisions." Plan, section 16, pg. 10.

## OPPOSING ARGUMENTS

The plaintiffs argue that taking urine samples for drug testing purposes constitutes a search and seizure under the Fourth Amendment. They cite a list of cases which agree with that assertion. Since a variety of private medical facts about a person can be detected in their urine, the plaintiffs assert that an individual has a reasonable expectation of privacy with respect to its discharge and the detection of the private information therein.

The plaintiffs argue that the Fourth Amendment requires Washington Township to obtain a warrant based on full probable cause in order to institute a urinalysis drug search of its police officers. However, the plaintiffs admit that the warrant requirement of the Fourth Amendment is not "inviolate." Plaintiffs' brief at 7. Therefore, they argue in the alternative that at least a reasonable suspicion of illegal drug use by an officer must exist before the officer may be ordered to submit to a urinalysis.

The plaintiffs believe that the reasonable suspicion standard is justified by a balancing of the interests at stake here. They rely on the fact that Washington Township has not identified an existing drug problem among its police officers. The plaintiffs do not dispute the Township's need to ensure that police officers do not use illegal drugs. However, they argue that mandatory urine testing in the absence of even a reasonable suspicion is an excessively intrusive means to achieve that end. While they concede that a police officer's expectation of privacy may be diminished somewhat, they insist that it is not so diminished as to permit the types of tests, absent reasonable suspicion, which the Township is seeking to conduct here.

The plaintiffs especially oppose the Township's attempt to drug test police officers on a random basis. They argue that randomness provides no standard at all to measure when a given search is reasonable. They argue that random testing has the same ultimate effect as the mass testing of all police officers. They observe that courts have disallowed the mass testing of municipal employees under circumstances similar to those presented here.

Even though the proposed tests are not aimed at gathering evidence for criminal prosecution, the plaintiffs point out that an officer's career will hang in the balance pending the test outcome and that the result could be incorrectly reported for a variety of reasons.

The plaintiffs contend that the medical examinations called for in the drug testing policy are not bona fide medical examinations but are a mere subterfuge to conduct urinalysis drug tests under another label. They believe that the medical examination provisions are a "distractor" intended to permit the Township to urine test at its discretion. Plaintiffs' brief at 21. They point out that no medical guidelines, other than a drug-urine test, are established as a requirement of fitness for duty by police officers.

The defendants respond by arguing that the intrusion engendered by a mandatory urinalysis is minimal. They believe that a police officer has no reasonable expectation of privacy in opposition to the proposed tests, since a police officer enjoys limited privacy rights on the job and because there can be no reasonable expectation of privacy in the fact that an individual is using illegal drugs.

The defendants believe that random testing of police officers is the most efficient and effective way to ensure a drug-free police force. They concede that prior attempts to mass test municipal employees have been struck down as unreasonable by the courts. However, the defendants believe that their proposed drug testing plan has recognized and overcome the fatal defects which were present in those programs.

For example, the defendants believe that their program is reasonable because it would permit most officers to urinate in

private, because it is governed by a detailed set of written guidelines, and because the information obtained would be utilized for disciplinary but not for criminal purposes.

The defendants do not claim that a drug problem among the Township's police officers has been documented. They assert that their program is fully justified as a preventive effort and rely on statistics which indicate that a serious drug problem exists in society as a whole. These statistics, they maintain, create a reasonable concern by Township officials that employees are using or may in the future use illegal drugs.

To support their effort, the defendants rely on previous cases which have upheld the mandatory urine testing of jockeys, nuclear plant employees, flight service specialists and certain prison guards. Finally, the defendants maintain that mandatory urine testing has been "unanimously" upheld by recent federal circuit court decisions.

## A MANDATORY URINALYSIS CONSTITUTES A SEARCH

■ The Employee Drug Testing Program of Washington Township requires that municipal employees, including police officers, submit to urine testing aimed at detecting the presence of illegal drugs. The use of such mandatory drug testing procedures and the review of their legality in the courts are relatively modern phenomena. Nonetheless, among those courts considering the question, a consensus has developed that a mandatory urinalysis constitutes a search within the meaning of the Fourth Amendment. *McDonnel v. Hunter,* 809 F.2d 1302, 1307 (8th Cir.1987); *Shoemaker v. Handel,* 795 F.2d 1136, 1141 (3d Cir.), *cert. denied* — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986) (implicit finding that mandatory urinalysis constitutes a search); *Feliciano v. City of Cleveland,* 661 F.Supp. 578, 584 (N.D.Ohio 1987); *Capua v. City of Plainfield,* 643 F.Supp. 1507, 1513 (D.N.J.1986); *Jones v. McKenzie,* 628 F.Supp. 1500, 1508 (D.D.C.1986); *Lovvorn v. City of Chattanooga,* 647

F.Supp. 875, 879 (E.D.Tenn.1986); *Allen v. City of Marietta,* 601 F.Supp. 482, 489 (N.D.Ga.1985); *Storms v. Coughlin,* 600 F.Supp. 1214, 1217 (S.D.N.Y.1984). *Cf. Fraternal Order of Police v. City of Newark,* 216 N.J.Super. 461, 466, 524 A.2d 430 (App.Div.1987) (construing nearly identical provision of New Jersey Constitution).

While it is true that all individuals, by necessity, routinely dispense urine from their bodies, they usually do so in conditions of privacy where the bodily fluids are quickly disposed of and are not retrievable by others for testing purposes. "One does not reasonably expect to discharge urine under circumstances making it available to others to collect and analyze in order to discover the personal physiological secrets it holds." *Capua v. City of Plainfield,* 643 F.Supp. at 1513 (quoting *McDonell v. Hunter,* 612 F.Supp. 1122, 1127 (D.Iowa 1985)). The mandatory taking and testing of urine samples from Washington Township's police officers would therefore constitute a search.

Since the mandatory urine testing proposed by the defendant would constitute a search within the meaning of the Fourth Amendment, this court must determine whether the planned searches are constitutionally permissible. This entails an examination of the provisions of the Fourth Amendment in order to ascertain: whether a warrant must be acquired before undertaking such searches; whether probable cause or reasonable suspicion is needed to justify the searches; and whether the searches will be "reasonable," as required by the amendment.

The Fourth Amendment of the United States Constitution states that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The Fourth Amendment applies to the states through the Fourteenth Amendment.

*Wolf v. Colorado*, 338 U.S. 25, 27–28, 69 S.Ct. 1359, 1361–1362, 93 L.Ed. 1782 (1949).

"[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 *reh'g denied*, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971) (citing *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). The fundamental command of the Fourth Amendment is that searches and seizures be reasonable. *New Jersey v. T.L.O.*, 469 U.S. 325, 340, 105 S.Ct. 733, 743, 83 L.Ed.2d 720 (1985). While ordinarily a warrant and full probable cause are required to satisfy the reasonableness standard of the Fourth Amendment, the Supreme Court has stated that "in certain limited circumstances neither is required." *Id.* at 340, 105 S.Ct. at 743. (teacher or other school official may search students when there are "reasonable grounds for suspecting that the search will turn up evidence that student has violated or is violating either the law or the rules of the school." *Id.* at 341–42, 105 S.Ct. at 743–44). *See also Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 1401, 59 L.Ed.2d 660 (1979) (car may be stopped without a warrant and its driver detained while documents are checked if there is at least an "articulable and reasonable suspicion" that a motor vehicle violation or other illegality has occurred); *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 2d 889 (1968) ("stop and frisk" of individual by police officer is permissable if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.").

■ The Supreme Court, however, has not yet considered whether or not a warrant based upon full probable cause is required to justify the type of mandatory urine testing proposed here. Except in the case of a "well-delineated exception" to the warrant requirement, a court should not dispense with that requirement lightly. This court is mindful that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure...." *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879. However, the court also recognizes that where the purpose of the search is to detect the presence of an illegal substance in the body, the delay entailed in obtaining a warrant could well frustrate that purpose, due to the eventual dissipation of the substance searched for. *See Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966). Therefore, it may not be practicable for Washington Township to obtain a search warrant in a timely fashion when the need arises to test a police officer for the presence of drugs in his body. The strict requirement of obtaining a search warrant may be dispensed with if " 'the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.'" *New Jersey v. T.L.O.*, 469 U.S. at 340, 105 S.Ct. at 743 (quoting *Camara v. Municipal Court*, 387 U.S. 523, 532–33, 87 S.Ct. 1727, 1732–33, 18 L.Ed.2d 930 (1967)). The court therefore concludes that Washington Township authorities need not obtain a warrant before requiring that a police officer submit to urinalysis drug testing. The next question is the reasonableness of the warrantless searches proposed by Washington Township.

## RANDOM DRUG TESTING

The Township's proposed plan would permit drug testing to be initiated in a number of ways. However, the plaintiffs accurately assert that the random selection of police officers for drug testing is the "heart and soul" of the proposed policy. Random testing is also the "heart and soul" of the constitutional question before this court.

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in

which it is conducted, the justification for initiating it, and the place in which it is to be conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979).

The reasonableness of random drug testing in this case must be determined by balancing the need to conduct a random drug search against the resulting invasion of the police officers' expectation of privacy. *See O'Connor v. Ortega,* — U.S. ——, 107 S.Ct. 1492, 1499, 94 L.Ed.2d 714 (1987); *New Jersey v. T.L.O.,* 469 U.S. at 337, 105 S.Ct. at 741.

■ Washington Township asserts that random drug testing of its police officers is justified under the rationale of cases permitting the random urine testing of public employees engaged in highly-regulated activities. The court concludes that those cases are inapplicable to the present controversy.

The principle case involving mandatory random urinalyses of employees in a highly-regulated industry is *Shoemaker v. Handel,* 795 F.2d 1136, 1137 (3d Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 577, 93 L.Ed.2d 580 (1986). In *Shoemaker,* jockeys engaged in New Jersey's highly-regulated racing industry challenged certain rules of the State Racing Commission. Those rules permitted the state racing steward to direct jockeys to submit to breathalyzer and urinalysis tests designed to detect the presence of alcohol or drugs. *Id.* at 1137. The rules were implemented by randomly testing between three and five jockeys at the conclusion of each racing day. *Id.* at 1140.

In upholding the random searches of jockeys in *Shoemaker,* the Third Circuit found that both prongs of the test for a warrantless administrative search had been met. First, there was a strong state interest in conducting an unannounced search in those particular circumstances. New Jersey has a significant financial interest in the horse racing industry. That financial interest is dependent upon the confidence of the wagering public in the honesty and integrity of the sport. Second, the already pervasive regulation of the horse racing

industry had sufficiently reduced the expectation of privacy held by the jockeys engaged in racing in New Jersey. Among other things, the jockeys knew that warrantless searches of stables and drug testing of horses had previously been authorized by the State Racing Commission. *Id.* at 1142.

The *Shoemaker* court clearly stated that "[o]ur holding applies only to breathalyzer and urine sampling of voluntary participants in a highly-regulated industry." *Id.* at 1142 n. 5.

Washington Township's police officers are not engaged in a highly-regulated industry of the type dealt with in *Shoemaker.* While police officers certainly operate within a framework of regulatory controls, a police officer does not carry out his duties in the same "intensely-regulated" atmosphere as that experienced by a jockey participating in horse racing. *See Id.* at 1142; *Fraternal Order of Police v. City of Newark,* 216 N.J.Super. at 469, 524 A.2d 430. To apply the reasoning of *Shoemaker* to the police officers in this case would extend *Shoemaker* well beyond the limited scope which that court intended for its ruling.

*Rushton v. Nebraska Public Power Dist.,* 653 F.Supp. 1510 (D.Neb.1987), also involved a highly-regulated industry. The *Rushton* court largely relied on *Shoemaker* in permitting the random urine testing of personnel who had unescorted access to "protected areas of the Cooper Nuclear Station (CNS)." *Id.* at 1524–25.

Recent occurrences at nuclear power plants in this country and abroad have established that a mishap at such a facility can cause serious damage and alarm extending even beyond national borders. As the *Rushton* court noted, a strong state interest, even more compelling than that in *Shoemaker,* exists for ensuring the safety of the public, the workers and the plant facility. *Id.* at 1524. Consequently, many regulatory safeguards are in place at CNS and other such facilities. Indeed, the *Rushton* court recognized the "pervasive regulation" surrounding the nuclear industry as a whole. *Id.* at 1524.

There is no such pervasive regulation of the police officers in the case at hand. Any illusion that Washington Township's police force operates under a reduced expectation of privacy comparable to the situation in *Rushton* is dispelled by Judge Urbom's description of the Cooper Nuclear Station:

"The protected area of CNS is completely surrounded by a fence, except at the point where the fence meets the security building. To enter the protected area, one must proceed through the entrance of the security building and pass, in single file, through explosive and metal detector devices. Randon pat-downs are routinely performed and guards observe entrants for erratic behavior. Once within the confines of the protected area, each of the 700 individuals who are permitted unescorted access participate in the honor system. Variously located throughout the protected area are vital areas. Each vital area is a room with a door requiring a separate access code for entrance. The vital areas house the safety related equipment, the equipment designed to prevent or mitigate a radiological release." *Id.* at 1513.

.     .     .     .     .

"After an individual is admitted entrance, surveillance continues through the use of closed circuit television, microwave transmission, and personal observation.... [S]ecurity guards continually patrol the protected area. Moreover, the NRC routinely sends announced and unannounced personnel to CNS for inspection purposes. During the course of such inspections, it is not uncommon for a NRC representative to question CNS employees. Given all the foregoing considerations, I find that the plaintiffs have a diminished expectation of privacy while within the confines of CNS." *Id.* at 1525.

Washington Township's police officers do not work within the type of pervasive, intensive regulatory system which Judge Urbom describes in *Rushton*. It is clear that the decision in this case cannot rest on precedent which dealt with administrative searches in highly-regulated industries.

While the court has determined that Washington Township's police officers enjoy a greater expectation of privacy than employees in a highly-regulated industry, Washington Township believes that its officers' expectation of privacy is sufficiently diminished to permit what the defendant characterizes as minimally intrusive urine searches.

The Constitution does not protect every subjective expectation of privacy that a person might hold. In order to be protected under the Fourth Amendment, an expectation of privacy must also be one that society is "prepared to recognize as legitimate." *New Jersey v. T.L.O.*, 469 U.S. at 338, 105 S.Ct. at 742 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984).

Public employees, such as police officers, may have a lessened expectation of privacy with respect to their employment, but they do not surrender all of their constitutional rights when they accept a public position. *See Lovvorn*, 647 F.Supp. at 880. In fact, the legitimate privacy interest of a public employee may be substantial. *O'Connor v. Ortega*, 107 S.Ct. at 1500. The reasonableness of the employee's expectation of privacy and the appropriateness of a proposed search must therefore be analyzed in the context of each employment setting. *Id.* at 1497.

■ The urine testing proposed here would entail a significant amount of intrusion into the private affairs of Washington Township's police officers. Even limited searches of the person constitute a severe intrusion upon "cherished personal security." *Terry v. Ohio*, 392 U.S. at 24–25, 88 S.Ct. at 1881–1882. "In a civilized society, one's anatomy is draped with constitutional protections." *United States v. Afanador*, 567 F.2d 1325, 1331 (5th Cir.1978). The taking of a urine sample in order to reveal the personal physiological information contained therein, particularly the presence of illegal drugs, is a considerable intrusion upon an individual's reasonable expectation of privacy. *See, e.g., Feliciano*, 661 F.Supp. at 586.

While the court has observed that the issue of mandatory drug testing of employees is a relatively modern phenomenon, the court does not operate in a vacuum of legal analysis in this area. Within the past two years there has been a plethora of reported decisions dealing with the propriety of subjecting public employees to mandatory urinalysis tests. The overwhelming consensus of these cases is that a mandatory urinalysis intrudes upon a public employee's reasonable expectation of privacy when it is carried out in the absence of a reasonable suspicion that the employee has been using illegal drugs. *McDonnel v. Hunter*, 809 F.2d 1302, 1308–1309 (8th Cir. 1987) (while prison guards identified as having regular, daily contact with prisoners must submit to random urinalysis, other guards within institution may only be tested on basis of reasonable suspicion); *Feliciano*, 661 F.Supp. at 596 (N.D.Ohio 1987) (individual suspicion required to drug test police academy cadets); *American Federation of Gov't Employees v. Weinberger*, 651 F.Supp. 726, 739 (S.D.Ga.1986) (reasonable suspicion needed for urinalysis of civilian police employed by Department of Defense); *Capua*, 643 F.Supp. at 1522 (reasonable suspicion needed to test firefighters); *Jones v. McKenzie*, 628 F.Supp. at 1508–1509 ("particularized probable cause" needed to test school bus attendant); *Lovvorn*, 647 F.Supp. at 883 (reasonable suspicion needed to test firefighters); *Penny v. Kennedy*, 648 F.Supp. 815, 817 (E.D.Tenn. 1986) (reasonable suspicion needed to test police officers); *Fraternal Order of Police v. City of Newark*, 216 N.J.Super. at 474, 524 A.2d 430 (reasonable suspicion required for testing of police officers); *City of Palm Bay v. Bauman*, 475 So.2d 1322, 1326 (Fla.Dist.Ct.App.1985) (reasonable suspicion needed to test police or firefighters); *Caruso v. Ward*, 133 Misc.2d 544, 506 N.Y.S.2d 789, 799 (Sup.Ct.1986) (reasonable suspicion needed to test members of organized crime control bureau); *Patchoque-Medford Congress v. Bd. of Ed.*, 119 A.D. 2d 35, 505 N.Y.S.2d 888, 891 (N.Y.App.Div. 2nd Dept.1986), *aff'd.* 70 N.Y.2d 57, 517 N.Y.S.2d 456, 510 N.E.2d 325 (1987) (rea-

sonable suspicion required to test public school teacher).

It follows then that a broad class of public employees, such as "all municipal employees" or "all police officers," may not be subjected to random urinalysis, since such a testing program results in searches without any level of individualized suspicion whatsoever. *See McDonell*, 809 F.2d at 1308–1309 (only those guards identified as having regular, daily contact with prisoners may be randomly tested, reasonable suspicion is required to test all others); *City of Palm Bay v. Bauman*, 475 So.2d 1322 (Fla.Dist.Ct.App.1985) (random testing of police and firefighters prohibited); *Caruso v. Ward*, 506 N.Y.S.2d at 799 (random testing of police officers prohibited).

The random drug testing which the defendants propose in this case can be analogized to previous attempts to "mass test" an entire group of public employees. The reasoning employed in cases which have disallowed the urine testing of groups of public employees *en masse* is applicable to the random testing program proposed here.

Mass testing programs have generally been disallowed because they are not based on a standard of individualized, reasonable suspicion. *Feliciano*, 661 F.Supp. at 596; *American Federation of Gov't Employees*, 651 F.Supp. at 739 (S.D.Ga.1986); *Capua*, 643 F.Supp. at 1522; *Jones v. McKenzie*, 628 F.Supp. at 1508–1509; *Lovvorn*, 647 F.Supp. at 883; *Penny v. Kennedy*, 648 F.Supp. at 817; *Fraternal Order of Police v. City of Newark*, 216 N.J.Super. at 474, 524 A.2d 480; *City of Palm Bay v. Bauman*, 475 So.2d at 1326; *Patchoque-Medford Congress v. Bd. of Ed.*, 505 N.Y.S. 2d at 891.

Both random and mass testing programs entail the search of individuals whether or not there is any reason to suspect that they have used illegal drugs. Eventually, a random drug testing program will subject the entire Washington Township police force to a mandatory urinalysis. In that respect, the only distinction between random and mass testing is that in a random drug testing program the entire group is tested on a piecemeal basis.

Thus, the random drug testing program proposed by Washington Township does not differ in a constitutionally significant way from the mass testing procedures which were ruled impermissable in the cases cited above.

Washington Township mistakenly asserts that its proposal has cured the constitutional defects which invalidated mandatory drug testing programs in other cases, by arguing that previous testing programs have been struck down for reasons other than a lack of individualized, reasonable suspicion. For example, the defendant notes that in *Capua*, there was a highly intrusive mass round-up of all the firefighters in a firehouse for testing. *See Capua*, 643 F.Supp. at 1511.

Judge Sarokin was justified in reacting strongly to the surprise testing, *en masse*, of the Plainfield firefighters. *Capua*, 643 F.Supp. at 1521. However, this court does not find that the result in *Capua* would differ if the mass testing had been carried out in a less offensive manner. The constitutional standard enunciated in *Capua* was that mandatory department-wide urine testing was not permissable because it was not based upon "individualized, reasonable suspicion." *Id.* at 1522. Mass or random testing, though it might be carried out in a more civilized manner, will still fail to meet that standard.

Washington Township also defends its planned random urine testing program on the grounds that it would operate under a set of well-defined written standards and procedures. It is true that previous opinions have decried the absence of well-defined administrative guidelines and standards in drug testing programs. *See, e.g., Capua*, 643 F.Supp. at 1521. However, the standard which was most significantly absent from those programs was one authorizing testing only on the basis of individualized suspicion. *See Lovvorn*, 647 F.Supp. at 880–81. The adoption and dissemination of a written drug testing policy will not satisfy the Fourth Amendment where the effect of that policy is to expose the individual to a constitutionally unreasonable search.

Washington Township's plan would give its employees at least sixty days advance notice before testing would begin. Advance notice of Washington Township's drug testing policy does not render it reasonable. Washington Township's drug policy offers its employees the choice of either submitting to an unreasonable search or risking the loss of their employment. A government employer cannot require that employees submit to an unconstitutional search as a condition of their employment, *McDonell*, 809 F.2d at 1310 (citing *Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968)). Nor would the fact that employees remained in their jobs after the announcement of the drug testing policy amount to consent to the proposed searches. Even if all employees were required to sign a form consenting to an otherwise unreasonable search, the form would not operate as a waiver of their constitutional rights. *McDonell*, 809 F.2d at 1310.

Nor does the fact that subject police officers would, in most cases, be permitted to urinate in private reduce the intrusiveness of the search sufficiently to satisfy the Fourth Amendment. Urination is a highly private act which is most often carried out in an unobserved setting. Therefore, the taking of urine samples under direct supervision would be an additionally intrusive procedure. *Feliciano*, 661 F.Supp. at 586. However, the essence of the search involved in any urinalysis is the taking of urine in order to "discover the personal physiological secrets which it holds." *Capua*, 643 F.Supp. at 1513. "This search involves 'probing into an individual's private life' as surely as if an employer would enter an employee's home to inspect for drugs or other contraband or to obtain more information about that employee." *Feliciano*, 661 F.Supp. at 586. Thus, the taking of a urine sample for drug testing, even in an unobserved setting, intrudes upon a police officer's reasonable expectation of privacy.

The fact that Washington Township's testing will be limited to the detection of illegal drugs does not reduce the intrusive-

ness of the search. The defendant's assertion that police officers have no legitimate right to privacy regarding illegal drug use is without merit. Clearly, random drug testing will subject the majority of innocent police officers to a highly intrusive search. A search under the Fourth Amendment must be "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." *New Jersey v. T.L.O.*, 469 U.S. at 341, 105 S.Ct. at 744. The Township's argument attempts to introduce an element of hindsight into the court's analysis which is wholly impermissable under the Fourth Amendment. The assertion that individuals have no right to object to an unreasonable search because it is aimed at uncovering wrongdoing is an argument which would render the Fourth Amendment's protection meaningless. The "constitutionality of a search cannot rest on its fruits." *Capua*, 643 F.Supp. at 1516.

The defendants' proposed plan indicates that "[d]rug testing shall not be conducted for the purpose of gathering evidence for use in criminal proceedings." Plan, section 17, pg. 11. The plan states that any employee found to be using illegal drugs will be referred to an Employee Assistance Program for "assessment, counseling, and referral for treatment or rehabilitation as appropriate." Plan, section 17, pg. 10. The policy also seems to give the Township the authority, at its discretion, to discipline or dismiss such employees. The proposal indicates that the Township will initiate action to remove employees who refuse counseling or rehabilitation or who are found to use illegal drugs a second time.

The Fourth Amendment is fully applicable here even though the proposed searches are not undertaken for the purpose of uncovering evidence for criminal prosecution. The Supreme Court "has never limited the Amendment's prohibition on unreasonable searches and seizures to operations conducted by the police. Rather, the Court has long spoken of the Fourth Amendment's strictures as restraints imposed upon 'governmental action'—that is, 'upon the activities of sovereign authority.' " *New Jersey v. T.L.O.*, 469 U.S. at 335, 105

S.Ct. at 740 (quoting *Burdeau v. McDowell*, 256 U.S. 465, 475, 41 S.Ct. 574, 576, 65 L.Ed. 1048 (1921)). "The basic purpose of this Amendment, as recognized in countless decisions of this Court, is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.... Because the individual's interest in privacy and personal security 'suffers whether the government's motivation is to investigate violations of criminal laws or breaches of other statutory or regulatory standards, ... it would be 'anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior.' " *New Jersey v. T.L.O.*, 469 U.S. at 335, 105 S.Ct. at 740 (citations omitted). The Fourth Amendment protects the Township's police from any unreasonable searches designed to uncover evidence of drug use for disciplinary purposes.

The court fully recognizes the Township's legitimate need to ensure that its employees, especially police officers, do not engage in the use of illegal drugs, on or off-duty. Drug abuse by police officers can certainly impair their performance and create situations in which members of the public are placed at risk. This important need to ensure a drug-free public workforce has been recognized in virtually all of the decisions which have reviewed mandatory drug testing programs. *See e.g., Lovvorn*, 647 F.Supp. at 879; *Penny*, 648 F.Supp. at 817.

The standard of reasonable, individualized suspicion recognizes this legitimate need of the government and adequately accomodates it in this case. *See, e.g., Lovvorn*, 647 F.Supp. at 883; *Capua*, 643 F.Supp. at 1518; *Fraternal Order of Police v. City of Newark*, 216 N.J.Super. at 473, 524 A.2d 430.

The court has found that a warrant is not necessary to authorize the drug testing of suspected police officers because the evidence of drug abuse is evanescent and the government has a legitimate need to uncover such evidence in a timely fashion. The threshold requirement of reasonable suspi-

cion to justify such a warrantless intrusion is an appropriate lessening of the "probable cause" ordinarily required for a Fourth Amendment search. This standard allows the government to act upon reasonable suspicion based on objective facts and all reasonable inferences drawn therefrom. Objective facts leading to reasonable suspicion may be derived from a variety of sources, including "physical observation of police officers, citizens complaints, tips from other law enforcement agencies and other means." *Penny,* 648 F.Supp. at 817. Such methods of arriving at reasonable suspicion adequately serve the government's need to identify and test individual police officers who may be using illegal drugs.

From the standpoint of protecting a police officer's reasonable expectation of privacy, this standard will permit a magistrate to review, after the fact, the reasonableness of an ordered search. Having dispensed with the requirement that a magistrate approve a warrant prior to searching, the court believes it is important in this case to establish at least a minimal standard by which an individual can seek judicial review of the actions taken against him. In contrast, under the proposed random testing plan offered by the Township, all randomly-conducted searches would be per se "reasonable" and there would be no opportunity for review on an individualized basis. The Township has failed to demonstrate that it needs to undertake such "carte blanche" random searches of its police officers.

Washington Township has based the need to randomly drug test its police officers on the fact that drug abuse is a statistically wide-spread problem in the United States. No such wide-spread problem has been identified among the Washington Township police. There has been no assertion that any member of the Washington Township police force has been involved in illegal drug use. Instead, the Township has recited a series of statistics regarding the level of illegal drug use in our society as a whole.

Illegal drug use is indeed a serious problem in our society. However, the court cannot permit statistics drawn from the mass of society to authorize the urine testing of an entire police force which has not been implicated in any illegal drug use.

In balancing the governmental need against the private intrusion presented by random testing, the absence of a "showing that drug use is widespread among the affected employees or that it presents an identifiable risk to the public[,]" is a factor heavily weighing in favor of the privacy interests of the individuals affected. *Fraternal Order of Police,* 216 N.J.Super. at 472, 524 A.2d 430. *See also Feliciano,* 661 F.Supp. at 588; *Lovvorn,* 647 F.Supp. at 882; *Penny,* 648 F.Supp. at 816–17; *Capua,* 643 F.Supp. at 1516; *City of Palm Bay,* 475 So.2d at 1325; *Caruso,* 506 N.Y. S.2d at 795, 799.

The defendant relies on *Nat'l Assoc. of Air Traffic Specialists v. Dole,* No. A87–073, slip op. (D. Alaska 1987). In *Dole,* flight service specialists were required by the Federal Aviation Administration (FAA) to be tested via an unobserved urinalysis for a variety of illegal drugs as part of a yearly medical examination. The medical examination was necessary in order for the flight specialists to retain a medical clearance to perform safety-related duties within the FAA. A positive test result in the yearly physical would "provide reasonable suspicion that the employee is a substance abuser and will subject the employee to more intrusive observed random urinalysis testing for a period of one year." *Dole,* slip op. at 1–2.

The flight service specialists in *Dole* sought a preliminary injunction to halt the testing program. In denying that request, Judge Fitzgerald discussed statistical evidence of drug abuse in society as a whole, which he found to be "compelling." *Dole,* slip op. at 53. However, Judge Fitzgerald had already determined that the "close and pervasive regulation of aviation related activities is well established and that air safety relates to serious risks or hazards which require close and constant attention." *Dole,* slip op. at 34. The judge discussed

*Rushton* and *Shoemaker* at length, *Dole,* slip op. at 29–35, and concluded that "[i]f horse racing is recognized as a closely or pervasively regulated activity, then aviation activities and the aviation industry are as much or possibly more closely regulated." *Dole,* slip op. at 34. This court has already determined that cases such as *Shoemaker* and *Rushton,* dealing with highly-regulated industries, are inapplicable here. *See supra.*

Further, ·while Judge Fitzgerald found the statistical evidence of widespread drug abuse in our society to be "compelling," *Dole,* slip op. at 53, he also observed that in 1986, forty-five air traffic controllers from fourteen cities had entered drug rehabilitation programs. The judge concluded that "[o]bviously, the agency has evidence of a substance abuse problem involving personnel performing safety-related duties." *Dole,* slip op. at 6. There has been no similar showing regarding a drug problem within Washington Township's police force.

The follow-up "random" testing in *Dole* was carried out only on the basis of individualized suspicion. Individuals who had already tested positive for drugs in a yearly physical exam could be re-tested at random times during the subsequent year. *Dole,* slip op. at 2.

Judge Fitzgerald did not review a proposed plan of the Department of Transportation which would include truly random testing of employees in critical safety and security positions. *Dole,* slip op. at 70. Therefore, the *Dole* court did not authorize the type of truly random drug-testing plan proposed here.

The need to ensure that the Township's police are drug-free is an important one. Important public safety concerns are associated with a police officer's duties. However, the need to prevent a major airline disaster presents a far more compelling rationale for drug testing than those presented by the Township of Washington

in this case. Judge Fitzgerald reviewed the vital role that flight service specialists play in preventing air disasters. *Dole,* slip op. at 49–53.

Air traffic controllers and flight service specialists hold thousands of lives in their hands on a daily basis. They are engaged in an industry that is already pervasively regulated. Consequently, their expectation of privacy with respect to their employment is already significantly diminished. There is evidence that drug abuse is already a serious problem within their ranks. These compelling circumstances are absent in the present case. Therefore, the task of maintaining a drug-free police force in Washington Township may reasonably be pursued by less severe methods.[1]

Washington Township's efforts to uncover illegal drug use by police will not suffer because urine testing must be based on reasonable suspicion. Less intrusive means, such as direct observations of officers by their superiors and co-workers, will be strong components of an on-going effort to detect drug abuse among officers. When the objective facts lead to a reasonable suspicion that a particular officer is using drugs, the Township may order the officer to submit to a urinalysis to confirm or disprove that suspicion.

A random drug testing program is not the most efficient method of detecting drug abuse. A random test may reveal that the individual tested has recently used an illegal drug. However, by its very randomness, it is just as likely to subject an innocent person to testing. It is evident that random searches of citizens' homes would not be an efficient means to search for the evidence of crimes. Likewise, the energies devoted to a random drug testing program can be more efficiently spent examining individual behavior and other objective facts to determine when reasonable suspi-

1. For these reasons, the court's decision in this case is not inconsistent with the holding in *American Federation of Gov't Employees v. Dole,* 670 F.Supp. 445 (D.D.C.1987). In that recent decision, Judge Gesell approved a Department of Transportation plan which permits the random testing of "certain employees in sensitive positions." At 446. Ninety-four percent of the "critical positions" subject to testing were in the aviation industry, *e.g.* air traffic controllers and aircraft mechanics. *Id.* at 446.

cion dictates that a search be directed at a specific officer.

Washington Township's proposed drug testing plan already has a provision authorizing the Township to order a urinalysis when a reasonable suspicion exists that a particular officer is using drugs. The existence of this effective and less intrusive means to the same end mitigates against the use of more intrusive, random testing. *E.g., Penny v. Kennedy,* 648 F.Supp. at 815.

The defendant attempts to characterize several appellate court decisions as representing the "unanimous" approval by circuit courts of mandatory drug testing plans. Nothing in the recent decisions of our appellate courts conflicts with the standards the court has established here. No decision has authorized the random testing of a wide group of municipal employees such as the police officers represented here.

In *McDonell v. Hunter,* the Eighth Circuit reviewed proposed random urinalysis searches of individuals employed within correctional facilities. 809 F.2d at 1304–1305. The court observed that a prison is 'a unique place fraught with serious security dangers." *Id.* at 1308 (quoting *Bell v. Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884). The Eighth Circuit found that a prison employee's reasonable expectation of privacy is reduced by this unique surrounding. *See id.* at 1308. However, the court authorized the limited uniform or random urine testing of only those guards who have "regular contact with the prisoners on a day-to-day basis in medium or maximum security prisons." *Id.* Even within the highly-regulated environment of a prison's confines, the court ruled that all other prison employees could only be tested:

"on the basis of a reasonable suspicion, based on specific objective facts and reasonable inferences drawn from those facts in light of experience that the employee is then under the influence of drugs or alcohol or that the employee has used a controlled substance within the twenty-four hour period prior to the required test. The demand for urine,

blood, or breath specimen should be made only on the express authority of the highest officer present in the institution, and the specific, objective facts should be disclosed to the employee at the time the demand is made." *Id.* at 1308–1309.

*McDonell* is persuasive authority that random drug testing may only be carried out with respect to a well-defined group of individuals in the presence of some compelling government need and a severely reduced expectation of privacy. The *McDonell* court preserved the individualized, reasonable suspicion standard and buttressed it with considerable safeguards for most of the employees within correctional facilities.

Washington Township's police officers enjoy a greater expectation of privacy than employees within a correctional facility. They do not operate within the highly-regulated and uniquely dangerous surroundings of such a facility. Therefore, they are deserving of at least as much protection as the court in *McDonell* afforded to those prison guards who do not have regular, daily contact with prisoners in medium and maximum security prisons.

In *Division 241 Amalgamated Transit Union v. Suscy,* 538 F.2d 1264 (7th Cir.) (*per curiam*), *cert. denied,* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632 (1976), the court permitted a plan which authorized the blood and urine testing of "[o]perating employees directly involved in any serious accident such as a collision of trains, collision of buses, derailment, ... or serious collision with vehicle or fixed object...." *Id.* at 1266. Such tests were only carried out with the additional concurrence of two supervisory personnel. *Id.* at 1267. This court agrees that following a serious masstransit collision the public interest is sufficiently compelling to authorize the testing approved in *Suscy.* Absent a serious accident, the regulations approved in *Suscy* only permitted the testing of individual bus drivers who were suspected of being under the influence of drugs or alcohol. *Id.* at 1266. Therefore, *Suscy* is not inconsistent with the standard of individualized, reasonable suspicion which the court has adopted

here. *Suscy* cannot be used to justify the random drug testing of an entire police force.

In *National Treasury Employees Union v. Von Raab*, 816 F.2d 170, 177 (5th Cir.), *stay denied,* —— U.S. ——, 107 S.Ct. 2479, 96 L.Ed.2d 372 (1987), the court permitted that a drug urinalysis be required of customs service employees who seek a transfer to certain "sensitive positions." The *Von Raab* court relied on several factors which do not exist in this case. First, the testing was limited only to those employees who set in motion an application to be transferred to a "sensitive position." In the present case, Washington Township wishes to randomly test all police officers, regardless of their duties. The tests here would be initiated by the government's random selection process, not by an officer's pursuit of a more "sensitive" position. Second, the *Von Raab* court believed that the plan it was reviewing was "to some extent, consensual . . .[,]" since the affected employees could avoid the urinalysis by withdrawing their application for the sensitive position. No adverse consequences would result from such a withdrawal. *Id.* at 178. Washington Township's random drug testing plan would permit no such discretion by selected employees, short of leaving the police force altogether. Third, *Von Raab* analogized employees who seek sensitive customs service positions involving "drug interception" to employees engaged in highly-regulated activities. *Id.* at 179–80. The operation of Washington Township's police force is not analogous to the operation of a highly-regulated industry. Thus, *Von Raab* does not authorize the type of mandatory, random urinalysis of all public employees which Washington Township is proposing here.

The court has found no decision by a circuit court which would justify the random drug testing of Washington Township's police force. Quite to the contrary, the trend within the judiciary has been to require individualized, reasonable suspicion before a public employee may be drug tested by urinalysis.

## MANDATORY ANNUAL URINALYSIS DRUG TESTING

Washington Township's proposed drug testing policy also requires each municipal employee to undergo a yearly medical examination in the month of their birth. This medical examination would "include" a urinalysis aimed at detecting illegal drug use. The proposed policy goes on to say that "[t]he above guidelines do not in any way prohibit or regulate the Township from requiring more than one regularly scheduled and announced medical examination of employees of certain municipal departments to ensure that employees are physically fit to perform their duties without risk of harm to themselves or to others." Plan, section 4, pg. 3.

The plaintiffs contend that the "medical examinations" called for in the proposed policy are a mere "pretextual sham" to accomplish urinalysis drug testing. The defendant cites *Rushton* and *Dole* as cases which authorized urinalysis drug testing as part of annual employee physicals. The court has already distinguished both of those cases on the grounds that they dealt with employees in highly-regulated industries.

Section four of the proposed drug testing policy states simply: "All municipal employees will be required to have an annual medical examination as a condition of employment with the Township of Washington. The annual medical exam will include urinalysis testing." Plan, section 4, pg. 3.

■ The plaintiffs are not challenging, and this opinion does not address, whether the Township may require a bona fide yearly medical examination for all employees. The court's analysis of the plan presented by Washington Township indicates that it is plainly a drug testing plan and not a bona fide medical fitness plan. It is entitled "Drug Testing Program of the Township of Washington." Its twenty-five pages are devoted to the methods by which employees may be tested via urinalysis for illegal drug use. The requirement of an annual medical examination as a condition of employment is contained in one sentence, with the following sentence indicat-

ing that this annual exam will include a urinalysis test for drugs. No other types of physical tests or guidelines are established to determine when a municipal employee will be medically fit for duty.

The issue clearly presented by this plan is whether it is reasonable, under these circumstances, to require that all police officers submit to an annual urinalysis drug test. In the absence of reasonable suspicion, a police officer does not reasonably expect to be subjected to such a search. The Township attempts to justify its mandatory drug testing program by the mere desire to "prevent" a drug abuse problem. There has been no showing of a widespread drug abuse problem among the Washington Township police. The assertion by plaintiffs, that there is no evidence of drug abuse whatsoever, has gone unrebutted.

Based on a weighing of the factors in this case, it would be unreasonable to subject all members of the Washington Township police force to an annual urinalysis search for drugs. Urinalysis searches may only be ordered based on individualized, reasonable suspicion of illegal drug use. This less intrusive approach will be an effective means of uncovering drug abuse by individual police officers, while respecting the rights of those officers whose conduct is above such suspicion.

It is not clear whether section four of the proposed drug testing plan is intended to authorize additional "medical examinations" which would "include" urine testing. Perhaps the Township has merely reserved the right to conduct other "regularly scheduled and announced" medical tests of certain municipal employees, with no intent to include drug testing as a part of those examinations. If that is the case, this opinion does not deal with the issue of bona fide medical examinations of employees.

If, on the other hand, the Township is proposing the use of discretionary "medical examinations" in order to carry out drug testing, this would violate the standard of individualized, reasonable suspicion which must be met before a police officer may be subjected to such a search.

Plaintiffs, by virtue of their stipulation, do not challenge that aspect of the proposed plan which requires the pre-employment drug testing of police recruits. Therefore, this opinion does not address that portion of the Township's proposal.[2]

## CONCLUSION

In the court's decision today, certain important principles are upheld. Our police officers are not above the law. They may not engage in illegal drug use with impugnity. When a reasonable suspicion exists that one of the officers whom we rely on to uphold the law is in fact violating it—the government may take effective steps to uncover evidence of that wrongdoing.

Equally important, however, is the principle that our public servants are not beneath the protection of the law. Individual police officers who carry out their duties in a manner which is above any reasonable suspicion of wrongdoing are entitled to be free of intrusive searches of their persons. Just as the police officer may not search persons on the street without some reasonable suspicion, neither is he subject to standardless searches by his superiors.

Absent a more compelling need than was present in this case, the court is not prepared to replace the standard of reasonable suspicion, which a magistrate can review, with standardless searches initiated by a random computer program. The police officers of Washington Township are deserving of greater constitutional protection.[3]

---

**2.** The court notes that at least one court has found pre-employment urine testing to be permissable under the Fourth Amendment. *McDonell v. Hunter,* 612 F.Supp. 1122, 1130 n 2.6 (D.C. Iowa 1985), *modified on other grounds,* 809 F.2d 1302 (8th Cir.1987).

**3.** The court notes that a recent decision of the New Jersey State Appellate Division has also adopted a "reasonable suspicion" standard for

the drug testing of police officers. *Fraternal Order of Police v. City of Newark,* 216 N.J.Super. 461, 474, 524 A.2d 430 (App.Div.1987). In *Fraternal Order,* Judge Gaulkin relied upon Article I, Sec. 7 of the New Jersey Constitution, the language of which is nearly identical to that of the Fourth Amendment. *Id.* at 477, 524 A.2d 430.

## JUDGMENT AND ORDER

It is the judgment of this court that the Proposed Drug Testing Policy of Washington Township violates the Fourth Amendment insofar as it permits searches prohibited by the following injunction.

The defendant Washington Township, its officers, agents, servants and employees, are hereby enjoined from requiring police officers to submit samples of their urine to be tested for the presence of illegal drugs, except when there exists an individualized, reasonable suspicion based on objective facts and reasonable inferences drawn therefrom, that a particular police officer has engaged in the use of illegal drugs.

The defendants' motion for summary judgment is denied. The plaintiffs' motion for summary judgment is granted, consistent with the above opinion.