[No. 53616–3.   En Banc.   July 15, 1988.]

RON ALVERADO, ET AL, *Appellants,* v. WASHINGTON PUBLIC POWER SUPPLY SYSTEM, ET AL, *Respondents.*

*Hugh Hafer, Cheryl A. French,* and *Hafer, Price, Rinehart & Schwerin,* for appellants.

*Arlan O. Lund* and *Michael J. Davidson,* for respondent Washington Public Power Supply System.

*Frederick T. Rasmussen, Paul F. Mutty,* and *Riddell, Williams, Bullitt & Walkinshaw,* for respondent Bechtel Construction.

UTTER, J.—Plaintiffs brought an action to permanently enjoin the Washington Public Power Supply System (WPPSS) and Bechtel Construction, Inc. (Bechtel), a WPPSS contractor, from implementing a mandatory urinalysis drug testing program for prospective employees. Plaintiffs argue that this urinalysis program is an unlawful search and seizure under article 1, section 7 of the Washington Constitution. On a stipulated motion for summary judgment, the trial court granted the defendants' motion and dismissed the action. We find that federal regulations preempt the application of state law in this instance, and uphold the WPPSS preemployment drug screening under the administrative search exception to the fourth amendment to the United States Constitution.

WPPSS is a municipal corporation and joint operating agency created under RCW 43.52.250 *et seq.* It consists of 13 Washington public utility districts and 3 municipalities. WPPSS owns and operates Washington Nuclear Plant 2 (WNP 2), a commercial nuclear reactor located on the Hanford Nuclear Reservation in Benton County. Defendant Bechtel is a construction and maintenance contractor at WNP 2.

Plaintiffs in this action are members of Plumbers and Pipefitters Local 598. The union members are not employees of WPPSS but are instead hired by Bechtel to work on repairs and maintenance at WNP 2 when the plant is temporarily shut down. If hired to work at WNP 2, they must qualify for "special access" authorization which would allow them to work unescorted in all protected or vital areas of the plant. Because of the sensitive nature of the work, all jobs require the utmost skill, concentration and ability to follow established protocol. Before being hired, employees are subject to security screening, background investigation and psychological evaluation.

Only one of the plaintiffs has been a successful applicant for Bechtel employment at WNP 2. The other plaintiffs claim they reasonably expect to be employed during future shutdowns of the plant. When not working for Bechtel at WNP 2, the plaintiffs are likely to be working for another employer on an unrelated project.

WNP 2 has an operating license granted by the Nuclear Regulatory Commission (NRC) and virtually all of its activities are regulated by the NRC pursuant to authority granted to it under the provisions of the Atomic Energy Act of 1954, 42 U.S.C. § 2011 *et seq.* (1982). The NRC sets the standards and regulates the operation of all commercially operated nuclear power plants in the United States. NRC regulations of commercial nuclear facilities such as WNP 2 are pervasive, particularly in matters pertaining to safety. In the 3½ decades of federal regulation of this industry, the Atomic Energy Commission and its successor, the NRC, have developed an extensive array of regulations touching

nearly every aspect of plant operations, including personnel. *See* 10 C.F.R. §§ 0–199 (1987). The NRC maintains resident inspectors at the plant site to assure compliance with these regulations. This detailed oversight by the NRC enhances the safety of the highly complex and dangerous work performed at a nuclear power facility.

On August 5, 1982, the NRC published a proposed rule which would have required, as a condition of licensure, the adoption of programs assuring that personnel with unescorted access to protected areas of a nuclear plant are not under the influence of drugs or alcohol, or are not otherwise "unfit for duty". *See* 47 Fed. Reg. 33,980. However, the NRC deferred imposing fitness–for–duty (FFD) requirements for 2 years and instead agreed to accept a substitute program initiated by the nuclear utility industry. This industry initiative was coordinated by three associations: the Nuclear Utility Management and Human Resources Committee (NUMARC), Institute for Nuclear Power Operation (INPO) and Edison Electric Institute (EEI). The industry–initiated program is subject to the approval of the NRC.

In response to the NRC's proposed rule and the industry's recommendation, WPPSS established a "fit for duty" (FFD) program that followed industry guidelines and met the requirements of the NRC. WPPSS' FFD program went into effect on June 2, 1986 for WPPSS employees and August 1986 for contractor employees. This program requires new employees hired for over 30 consecutive days or any employee hired in a capacity requiring unescorted access to WNP 2 to undergo chemical testing as part of the preemployment medical evaluation. Current employees and previously tested employees, rehired within 1 year of termination, are not tested, except for cause. As required by WPPSS, Bechtel incorporated this drug screening program into its application process for those jobs it performs during plant shutdowns.

The FFD program challenged by the prospective employees in this case contains the following significant

features: multiple tests to confirm a "positive" test result; a written protocol assuring proper "chain of custody"; non-witnessed urine sample collection in a medical facility; testing of existing employees on a "for cause" basis and testing of all new hires (both contractor and WPPSS employees); and strict confidentiality of test results. The results of the test are for internal use only and will not be divulged to law enforcement agencies. The worst that can happen to a prospective employee who tests positive after several tests is that he is precluded from work at WNP 2 for 6 months.

In August 1986, the NRC formally withdrew the rule it had proposed 2 years earlier and instead published a "Statement on Fitness for Duty of Nuclear Power Plant Personnel." *See* 51 Fed. Reg. 27,921. In this statement, the NRC announced three major expectations of nuclear utilities in the effort to maintain a drug free work force: (1) to prohibit the sale, use, possession of alcohol or drugs within plant protected areas; (2) to require persons within plant protected areas to be fit for duty (*i.e.,* not under the influence of alcohol or drugs); and (3) to include certain minimum provisions regarding personnel access to vital areas, sanctions in the event of substance abuse, and "[e]ffective monitoring and testing procedures to provide reasonable assurance" that personnel in vital areas are fit for duty.

The NRC stated further that it would refrain from making any new rules in this area for another 2 years subject to the continued success of the industry initiatives and the NRC's ability to monitor the effectiveness of these programs. While allowing the commercial nuclear power industry some flexibility in implementing an FFD program, the NRC policy statement makes clear that it was not relinquishing its authority in this area and would not hesitate to impose sanctions on those facilities whose anti-drug programs were deficient. *See Rushton v. Nebraska Pub. Power Dist.,* 653 F. Supp. 1510, 1514 (D. Neb. 1987) (discussing the same NRC policy at issue in this case), *aff'd,* 844 F.2d 562 (8th Cir. 1988).

On December 3, 1986, plaintiffs filed a motion in Benton County Superior Court to preliminarily enjoin defendants from requiring job applicants to submit to drug testing as a condition of employment. The trial court denied the motion on December 15, 1986, and subsequently issued an order granting defendants' motion for summary judgment and dismissing the complaint with prejudice. Plaintiffs filed a notice of appeal on February 24, 1987. Believing this matter to involve "a fundamental and urgent issue of broad public import", RAP 4.2(a)(4), this court granted direct review.

This court's review of a summary judgment is de novo. Accordingly, a summary judgment will be affirmed if the pleadings, affidavits and admissions on file show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach,* 98 Wn.2d 434, 437, 656 P.2d 1030 (1982). The record in this case is stipulated and there are no genuine issues of material fact. No questions are raised regarding the reliability of the particular method of urine testing, the dimensions of the drug abuse that actually exists among nuclear power facilities, or the efficacy of this program in dealing with the problem. Furthermore, plaintiffs challenge only that part of the FFD program at WPPSS mandating a urinalysis drug screening for prospective employees.

I

Plaintiffs challenge the drug screening program as being unlawful under article 1, section 7 of the Washington Constitution. However, the constitutional principle of federal preemption precludes application of the state constitution to determine the validity of this drug testing program.

The issue of federal preemption was not raised by the parties in arguments before this court. However, this court has inherent authority to consider issues not raised by the parties if necessary to reach a proper decision. *See Siegler v. Kuhlman,* 81 Wn.2d 448, 502 P.2d 1181 (1972), *cert. denied,* 411 U.S. 983 (1973); RAP 12.1(b). It is proper

to do so when there is no dispute about the law. We conclude that consideration of federal preemption doctrine is necessary to properly resolve the matter before us. Although we frequently request further briefing or perhaps reargument on issues raised by the court, *see State v. Danforth*, 97 Wn.2d 255, 643 P.2d 882 (1982), we decline to do so here for reasons of judicial economy.

First, there is only one opinion by the United States Supreme Court regarding attempted state regulation of safety aspects of nuclear power facilities and it concludes, unequivocally, that "the entire field of nuclear safety concerns" has been preempted by federal law; there is simply no room for the application of state law to matters affecting nuclear safety. *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983). Therefore, further briefing on this issue by the parties is unlikely to lead this court to a contrary conclusion.

Second, our ruling on this issue does not work any injustice to the parties since the issue was raised in the trial court and the parties had notice that federal preemption could apply.

Third, the trial court did consider the issue and incorrectly concluded that *Pacific Gas & Elec.* did not deprive the court of jurisdiction or prevent it from applying state law. We conclude otherwise. Record of Proceedings, at 64–65. While *Pacific Gas & Elec.* does not deprive state courts of jurisdiction, it does narrow the scope of the court's analysis to federal law. The drug testing program at WNP 2 derives from federal authority and involves an area of public policy in which state action and state law has been preempted.

The doctrine of federal preemption is rooted in the "supremacy clause" of article 6, clause 2 of the United States Constitution which declares that the constitution and laws of the United States "shall be the supreme law of the land". Under the preemption doctrine, states are

deemed powerless to apply their own law due to restraints deliberately imposed by federal legislation. In such cases,

> *any* state or local action, however consistent in detail with relevant federal statutes, is held invalid . . . because the federal legislative scheme announces, or is best understood as implying, a congressional purpose to "occupy the field."

L. Tribe, *American Constitutional Law* § 6–25, at 479 (2d ed. 1988).

State law can be preempted in one of two ways. If Congress indicates an intent to occupy a given field, any state law falling within that field is preempted. *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982); *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947). Even if Congress has not indicated an intent to "occupy the field", state law is still preempted to the extent that it would actually conflict with federal law. *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142–43, 929, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963). State law is also preempted when it would hinder accomplishment of the full purposes and objectives of the federal regulations. *Hines v. Davidowitz,* 312 U.S. 52, 67, 85 L. Ed. 581, 61 S. Ct. 399 (1941).

Numerous cases have recognized the strong federal interest in atomic energy development and the concomitant preemption of state regulation over nuclear power operations. The preemption issue first arose in the nuclear energy context in *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir. 1971), summarily *aff'd,* 405 U.S. 1035 (1972). That court traced the history of atomic energy development in the United States from a government monopoly through the congressional decision in the Atomic Energy Act of 1954 (and subsequent modifications) to encourage commercial development under strict licensing arrangements. Concluding that states were precluded from regulating the discharge of radioactive effluence from nuclear facilities, the court concluded that "the federal

government has exclusive authority under the doctrine of preemption to regulate the construction and operation of nuclear power plants . . ." *Northern States,* at 1154. *See* Note, *A Framework of Preemption Analysis,* 88 Yale L.J. 363, 379–81 (1978). The Supreme Court reaffirmed its memorandum holding in *Northern States* in *Train v. Colorado Pub. Interest Research Group, Inc.,* 426 U.S. 1, 17, 48 L. Ed. 2d 434, 96 S. Ct. 1938 (1976).

■ While there is a presumption against finding federal preemption in ambiguous cases, *Maryland v. Louisiana,* 451 U.S. 725, 746, 68 L. Ed. 2d 576, 101 S. Ct. 2114 (1981), nuclear safety regulations present no such ambiguity. Indeed, the matter of safety at nuclear power facilities is a classic example of congressional intent to "occupy the field" and preempt *any* state action. As one learned treatise in this field has commented:

"The federal licensing scheme to control the development and utilization of atomic energy . . . is extraordinarily pervasive, probably more pervasive than any regulatory scheme considered by the Supreme Court in analogous [preemption] cases . . ."

Stason, Estep & Pierce, *Atoms and the Law* 1059 (1954), *cited in Northern States,* at 1153.

In *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983), the United States Supreme Court stated unequivocally that any state action pertinent to safety at a nuclear power facility was preempted, regardless of whether it conflicted with federal objectives. The Court found that "the Federal Government has occupied the *entire* field of nuclear safety concerns, except the limited powers expressly ceded to the States." (Italics ours.) *Pacific Gas & Elec.,* at 212. These limited powers include the regulation of radioactive effluence and the right to impose certain site and land–use requirements for the construction of nuclear power facilities. *Pacific Gas & Elec.,* at 212 n.25. States are also generally free to apply their own

tort law to compensate persons for injuries related to radiation hazards, to the extent that such state laws do not significantly interfere with federal regulation. *Goodyear Atomic Corp. v. Miller,* __ U.S. __, 100 L. Ed. 2d 158, 108 S. Ct. 1704 (1988); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 249–56, 78 L. Ed. 2d 443, 104 S. Ct. 615 (1984). While the states are generally free to regulate the *economic* aspects of nuclear power, *Pacific Gas & Elec.,* at 222, matters of nuclear *safety* are governed by federal law alone.

The drug testing program at issue in this case was instigated in an effort to promote safety at a federally regulated nuclear power plant. The plan was adopted pursuant to the express policy of the Nuclear Regulatory Commission engendered by the substantial increase in drug–related incidents involving personnel at nuclear power facilities. *Rushton,* at 1513. *See* Starr, *Drug Abuse at Nuclear Plants: The Alarm Bells Are Ringing,* Business Week (Oct. 28, 1985). While the NRC did not mandate the specific details of the WPPSS drug testing program, its August 1986 policy statement indicates that adoption of an effective drug testing program was a condition of continued licensure.

Since this safety issue was not "expressly ceded to the States", *Pacific Gas & Elec.,* at 212, federal law and regulations preempt state law. The constitutional validity of this drug testing program adopted pursuant to federal requirements in an industry that is pervasively regulated by the federal government must be determined by reference to the federal constitution alone. In this instance, it requires analysis under the Fourth Amendment.

## II

The Fourth Amendment protects against unreasonable searches and seizures. The reasonableness of a search or seizure depends upon a person's expectation of privacy in the place to be searched or the items seized, provided that the expectation is one that society is prepared to accept as

"reasonable". *Katz v. United States,* 389 U.S. 347, 361, 19 L. Ed. 2d 576, 88 S. Ct. 507 (1967) (Harlan, J., concurring).

▮ Government mandated urinalysis for drug testing of employees has been held to constitute a search and seizure within the meaning of the Fourth Amendment in every case in which the issue has arisen. *See, e.g., Railway Labor Executives' Ass'n v. Burnley,* 839 F.2d 575 (9th Cir.), *cert. granted,* ___ U.S. ___, 100 L. Ed. 2d 618, 108 S. Ct. 2033 (1988); *Everett v. Napper,* 833 F.2d 1507, 1509 (11th Cir. 1987); *Jones v. McKenzie,* 833 F.2d 335, 338 (D.C. Cir. 1987); *National Fed'n of Fed. Employees v. Weinberger,* 818 F.2d 935, 942 (D.C. Cir. 1987); *National Treasury Employees Union v. Von Raab,* 816 F.2d 170, 176 (5th Cir. 1987), *cert. granted,* ___ U.S. ___, 99 L. Ed. 2d 232, 108 S. Ct. 1072 (1988); *McDonell v. Hunter,* 809 F.2d 1302, 1307 (8th Cir. 1987); *Taylor v. O'Grady,* 669 F. Supp. 1422 (N.D. Ill. 1987); *Smith v. White,* 666 F. Supp. 1085, 1089 (E.D. Tenn. 1987); *Rushton v. Nebraska Pub. Power Dist.,* 653 F. Supp. 1510, 1523–24 (D. Neb. 1987), *aff'd,* 844 F.2d 562 (8th Cir. 1988); *Lovvorn v. Chattanooga,* 647 F. Supp. 875, 879 (E.D. Tenn. 1986); *Capua v. Plainfield,* 643 F. Supp. 1507, 1513 (D.N.J. 1986).

We agree with these courts that compulsory urinalysis under federal regulations qualifies as a search and seizure within the meaning of the Fourth Amendment. It invades an individual's reasonable and legitimate expectation of privacy and should not be tolerated unless the program meets constitutional safeguards.

This conclusion does not end the Fourth Amendment inquiry, however. "[T]he Fourth Amendment safeguards persons only against 'unreasonable searches and seizures.'" *National Fed'n,* 818 F.2d at 942. Whether a search is unreasonable and hence unlawful under the Fourth Amendment depends, in part, on the context within which it takes place and the manner in which it is conducted. *New Jersey v. T.L.O.,* 469 U.S. 325, 337, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985).

### III

A search and seizure is not constitutionally reasonable under the Fourth Amendment unless it is conducted pursuant to a valid warrant based upon probable cause to believe that a violation of law has occurred. *See Almeida–Sanchez v. United States,* 413 U.S. 266, 277, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973) (Powell, J., concurring); *New Jersey v. T.L.O.,* 469 U.S. 325, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985). The warrant requirement is subject to only a few "specifically established and well–delineated" exceptions. *See Mincey v. Arizona,* 437 U.S. 385, 390, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973); *Coolidge v. New Hampshire,* 403 U.S. 443, 454–55, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). A search that is neither supported by a warrant nor comes within one of the narrow exceptions to the warrant requirement is per se unreasonable and unconstitutional.

Since WPPSS does not have a warrant to conduct these searches, its drug testing program must meet the requirements of one of the narrow exceptions to be constitutionally valid. Given the pervasive regulations governing all operations of the nuclear power industry, we find the administrative search exception to be appropriate in evaluating the constitutionality of drug testing at WNP 2.

In a long line of cases beginning with *Camara v. Municipal Court,* 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967), the United States Supreme Court has set forth the requirements for valid administrative searches. Because routine inspections are often essential to adequate enforcement of valid government regulation, probable cause is not required. While warrants are still required for code–enforcement inspections of a home and most businesses, *Camara v. Municipal Court, supra; See v. Seattle,* 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967), warrantless searches are constitutionally tolerable as an exception to the warrant requirement for administrative inspections in "pervasively regulated industries." *See Colonnade Catering*

*Corp. v. United States,* 397 U.S. 72, 25 L. Ed. 2d 60, 90 S. Ct. 774 (1970) (liquor business); *United States v. Biswell,* 406 U.S. 311, 32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972) (firearms and munitions dealers); *Donovan v. Dewey,* 452 U.S. 594, 69 L. Ed. 2d 262, 101 S. Ct. 2534 (1981) (underground and surface mines); *New York v. Burger,* 482 U.S. 691, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987) (automobile junkyard).

There is no doubt that the nuclear power industry is such a "pervasively regulated industry". As stated above, virtually *all* of the activities involved in operating a nuclear power facility such as WPPSS are regulated by the Nuclear Regulatory Commission pursuant to an act of Congress. *Rushton,* 653 F. Supp. at 1525; *Smith v. White, supra* at 1086.

Balancing societal and individual interests is appropriate in determining the reasonableness of a warrantless administrative search in a pervasively regulated industry because searches in these contexts involve only limited threats to an individual's justifiable expectation of privacy. *Biswell,* at 316. *See Washington Massage Found. v. Nelson,* 87 Wn.2d 948, 953, 558 P.2d 231 (1976). The urinalysis involved here is neither an attempt to find evidence of wrongdoing nor to verify compliance with law; it is simply an effort to determine whether a particular applicant is physically and mentally fit for the job being sought. The work to be performed by these employees demands that each of them be fully alert at all times while on the plant site. The lingering effects of drug abuse can impair one's physical and mental capacity, and such impairment can have catastrophic consequences in the setting of a nuclear power facility. In a preemployment context there is no opportunity for supervisors or co–workers to observe behavior which could alert the employer to drug impairment.

The pervasiveness of the regulatory scheme gives advance warning to those employed in the nuclear power industry that their legitimate expectations of privacy are

substantially diminished.[1] This principle holds true whether the search is of the premises or of individuals employed on the premises. *See Rushton v. Nebraska Pub. Power Dist.,* 844 F.2d at 566 (nuclear power); *Shoemaker v. Handel,* 795 F.2d 1136 (3d Cir. 1986) (horse racing), *cert. denied,* 479 U.S. 986, 93 L. Ed. 2d 580, 107 S. Ct. 577 (1986); *McDonell v. Hunter,* 809 F.2d 1302 (8th Cir. 1987) (correctional institution).

Application of the administrative search exception to personal searches in the form of employee drug testing has been criticized by some courts and commentators. *See* Comment, *Shoemaker v. Handel: Alcohol and Drug Testing and the Pervasive Regulation Exception to the Fourth Amendment's Administrative Search Warrant Requirement,* 14 Hastings Const. L.Q. 173, 191–93 (1986). The essence of this criticism is that the administrative search doctrine has not been applied to individual searches before. But the reason why this doctrine has not previously been applied is that the underlying regulations for earlier administrative searches were concerned only with nonhuman factors in the workplace and there was no need to search individuals; in this instance, however, individuals employed in the nuclear power industry are the focus of the underlying federal regulations.

A panel of the Court of Appeals for the Ninth Circuit has recently ruled that the administrative search exception did not allow for government mandated drug testing of railway employees. *Railway Labor Executives' Ass'n v. Burnley,* 839 F.2d 575, 583–86 (9th Cir.), *cert. granted,* ___ U.S. ___,

---

[1]Some courts and commentators have gone further and suggest that a prospective employee has no Fourth Amendment protection from a government mandated urinalysis. *See McDonell v. Hunter,* 612 F. Supp. 1122, 1130 n.6 (S.D. Iowa 1985), *modified on other grounds,* 809 F.2d 1302 (8th Cir. 1987); *Lovvorn,* 647 F. Supp. at 881 n.7; *McCleod v. Detroit,* 39 Fair Empl. Prac. Cas. (BNA) 225 (E.D. Mich. 1985); Note, *Employee Privacy Rights v. Business Needs: Drug Testing in the Workplace,* 22 New Eng. L. Rev. 413, 417 n.26 (Dec. 1987); Lundberg, *Mandatory Unindicated Urine Drug Screening: Still Chemical McCarthyism,* 256 J. A.M.A. 3003, 3005 (1986).

100 L. Ed. 2d 618, 108 S. Ct. 2033 (1988). The court determined that despite the long history of close regulation of the railroad industry, the safety regulations were more directed at the premises, equipment and records of the owners and managers in the industry rather than their employees; since employees were not historically the focus of federal safety regulations, they could not have "put railroad employees on notice that their participation in the industry reduces their legitimate expectations of privacy in the integrity of their bodies." *Burnley,* at 585. In the absence of such notice, drug testing through urinalysis was too serious a personal intrusion to be accepted under the administrative search exception.

The decision by the Ninth Circuit did not foreclose application of the administrative search exception to searches of employees engaged in heavily regulated industries. In fact, that court cited approvingly the decision by the Third Circuit in *Shoemaker* which applied this exception in upholding the warrantless breath and urine testing of jockeys in the heavily regulated New Jersey horseracing industry. The Ninth Circuit panel stated that the search exception in *Shoemaker* was acceptable because in the regulatory scheme for the horseracing industry the jockeys are the principal regulatory concern. *Burnley,* at 585. The court noted that the jockeys were subject to thorough personal background investigations and constant monitoring, all of which gave the jockeys advance notice that their involvement in horseracing reduces their legitimate expectations of privacy. The court also distinguished the two cases on the ground that the New Jersey Racing Commission has always had the authority to set the qualifications for jockeys whereas the Secretary of Transportation is expressly precluded from exercising similar oversight of railway employees.

Considering those factors identified by the Ninth Circuit in *Burnley,* we conclude that the prospective employees at WNP 2 have much more in common with the jockeys in *Shoemaker* than the railroad employees in *Burnley.* Like

the jockeys but unlike the railroad employees, the workers at WNP 2 are subject to intensive background investigations which include credit checks, criminal records, medical and psychological evaluations; like the horseracing industry but unlike the railway industry, the regulatory agency with oversight of the nuclear power industry has the authority to establish the qualifications for employees; like the jockeys but unlike railroad employees, workers in the nuclear power industry are a "principal regulatory concern." As defendant Bechtel stated during argument in the court below,

> The premise of the Federal Atomic Energy policy has been that of trying to eliminate as much as possible any human error . . . to make it as perfect as it could be.

Report of Proceedings, at 50. These extensive regulations have given prospective employees at WNP 2 advance notice of their diminished rights of privacy. This approach has generally won approval even among those courts that have rejected drug testing in other circumstances. *See Capua v. Plainfield,* 643 F. Supp. 1507, 1518 (D.N.J. 1986); *National Treasury Employees Union v. Von Raab,* 649 F. Supp. 380, 386 (E.D. La. 1986), *vacated,* 816 F.2d 170 (5th Cir. 1987); Note, *A Proposal for Mandatory Drug Testing of Federal Civilian Employees,* 62 N.Y.U. L. Rev. 322, 345 (1987).[2]

██ We conclude that the administrative search exception for pervasively regulated industries may be extended to employees in the nuclear power industry. Even in pervasively regulated industries, however, the test for constitutional validity goes beyond a simple weighing of governmental versus individual interests. In *Burger,* the United States Supreme Court interpreted its *Dewey* decision as establishing three criteria for warrantless searches in pervasively regulated industries:

---

[2]We also find support for this position in current congressional legislation dealing with the use of polygraph tests by employers. Both houses of Congress have recently passed legislation that would severely restrict the use of polygraph tests by private employers, but allows such testing of current and prospective employees of the nuclear power industry. *See* H.R. 1212, 100th Cong., 2d Sess., § 7(e) (1988).

First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made. . . .

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." . . .

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." . . .

(Citations omitted.) *Burger,* 96 L. Ed. 2d at 614. Examples of a "constitutionally adequate substitute" include prior warning to those persons to be searched, limiting the scope of the search, and clear restraints upon the discretion of the investigating officers. *Burger,* 96 L. Ed. 2d at 614.

These criteria are the proper ones to be applied in evaluating the constitutionality of the WPPSS drug testing program. First, the "substantial government interest" at stake in this program is to ensure that personnel in vital areas of a nuclear power facility are fit for duty in one of the most sensitive and demanding industries in our economy; the public safety concerns are overwhelming.

Second, the warrantless inspections are necessary in this instance to further these public safety interests. The responsibilities of employees in vital areas of a nuclear power facility are of such a nature that any drug related impairment could have very serious consequences for the general public. Because of the government's overriding interest in preventing any drug–impaired employee from working in one of these vital areas, and the difficulty in determining by mere visual observation whether a prospective employee suffers from such impairment, routine drug testing in the context of preemployment screening is virtually the only way in which the operators of the WPPSS facility can effectively monitor compliance. *See* 3 W. LaFave, *Search and Seizure* § 10.2, at 33 (2d ed. 1988).

Third, the drug testing program contains "constitutionally adequate substitutes" for a warrant. All prospective employees are informed well in advance that a urinalysis will be necessary before they are hired for work; thus the

testing requirement comes as no surprise to them. The scope of this "search" is limited in that a nonwitnessed sample is collected in a medical facility and the results are kept confidential. Furthermore, the program provides for multiple tests if an applicant tests positive and the results are used only for the purpose of determining a prospective employee's fitness for duty. The only consequence of a positive test is that a prospective employee will not be considered for employment for 6 months. There is no permanent "stain" on an applicant's record. Because all prospective employees are so tested, the investigating officers have little, if any, discretion.

## IV

In conclusion, the doctrine of preemption renders our state constitution irrelevant to the issues presented by this drug testing program and the case must be decided on Fourth Amendment grounds alone. Applying the Fourth Amendment only, the drug testing program being implemented at the WPPSS facility for prospective employees is constitutional. It passes constitutional muster, however, not simply because society's interest in safety is greater than the individual's interest in privacy, but because the program meets the strict criteria announced by the United States Supreme Court to justify a warrantless administrative search.

We affirm summary judgment for the defendants.

PEARSON, C.J., BRACHTENBACH, DOLLIVER, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., and PETRIE, J. Pro Tem., concur.